# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO C. BUCKLEY, | CASE NO. 1:04-cv-05688-OWW-GBC PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RECOMMENDING RE-BRIEFING ON ONE ISSUE |
| v. | |
| ALAMEIDA, et al., | |
| Defendants. | (Doc. 126) |
| _____ / | OBJECTIONS DUE WITHIN THIRTY DAYS |

**FINDINGS and RECOMMENDATIONS**

I.   **Procedural History**

Plaintiff Antonio Cortez Buckley ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-1 (the Religious Land Use and Institutionalized Persons Act ("RLUIPA")).  At the times relevant to this complaint, Plaintiff was incarcerated at California Correctional Institution (CCI), in Tehachapi, California.  Doc. 126-2 at 12 (Def.'s Undisputed Facts). On September 29, 2003, Plaintiff filed the original complaint.  Doc. 1.  On March 23, 2007, Plaintiff filed the third amended complaint which the Court found to have stated cognizable claims against the following defendants: Calderon; Vo; Meadors; Reed; Kordan; Traynham; Papac; Winett; Woodley; Barker; Howard; Johnson; Mack; and Chappel ("Defendants"). Doc. 42; Doc. 44.  The Court issued the first discovery and scheduling order on September 19, 2007, which stated that the unenumerated 12(b) motion deadline was November 26, 2007, and the deadline for filing dispositive motions was August 7, 2008.  Doc. 65.  After Defendants failed to submit any

motions and the August 7, 2008, deadline has passed, the Court filed the second scheduling order setting trial dates. Doc. 77. On August 21, 2008, Defendants motioned to vacate the discovery and scheduling order and requested for the Court to reset the deadlines for dispositive motions. Doc. 80. On September 24, 2008, the Court vacated the previous scheduling order and reset the dispositive motion deadline for June 1, 2009. Doc. 84. In the order filed on September 24, 2008, the Court did not set a new deadline for unenumerated 12(b) motions. Doc. 84. On May 27, 2010, Defendants filed a motion for a seventy-four day extension to file dispositive motions and the Court granted the extension, setting the new deadline to August 9, 2010. Doc. 120; Doc. 121. On August 9, 2010, Defendants motioned for a thirty day extension to file dispositive motions which the Court granted, setting the new deadline for September 14, 2010. Doc. 122; Doc. 123. On September 13, 2010, Defendants filed a motion for summary judgment. Doc. 126. After the Court granted two motions for extension of time, Plaintiff filed an opposition. Doc. 131; Doc. 139; Doc. 143; Doc. 144; Doc. 145; Doc. 146. Defendants did not file a reply.

## II.   **Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not mine the record for triable issues of fact. *Id.*

A.   **Claim 1: Retaliation by Means of Excessive Pat-Down Searches**

1.   **Plaintiff's Allegations in Amended Complaint**

Plaintiff states that on February 27, 2002, Plaintiff fled an inmate grievance at CCI against Correctional Officer Sutherland for submitting a false affidavit and then filed complaints with the Kings County Grand Jury, the Inspector General's Office, the FBI and Federal Court. Doc. 42 (Third Amend. Compl. at 13). Plaintiff alleges that based on these complaints, the following Defendants

retaliated against him through excessive body searches: 1) Howard; 2) Johnson; 3) Barker; 4) Chappel; 5) Papac; 6) Meadors; and 7) Winett.  Doc. 42 at 13; Doc. 44 at 5.

## 2.    Defendants' Motion for Summary Judgment[1]

Defendants argue that Plaintiff cannot prevail on the retaliation claim because he fails to demonstrate that the multiple pat-down searches did not reasonably advance a legitimate correctional goal.  Defendants assert that pat-down searches are a necessary security measure used by correctional staff to ensure that inmates are not bringing contraband, weapons, or other unapproved items into a particular area.  Doc. 126-1 at 11 (MSJ).  As evidence, Defendants cite to the declarations of Defendants Barker, Chappel, Howard, Johnson, Meadors and Papac.  Doc. 126-6 (Ex. F at ¶ 5 (Barker Decl.)); Doc. 126-6 (Ex. G at ¶ 5 (Chappel Decl.)); Doc. 126-9 (Ex. I at ¶ 5 (Howard Decl.)); Doc. 126-9 (Ex. J at ¶ 5 (Johnson Decl.)); Doc. 126-9 (Ex. L at ¶ 5 (Meadors Decl.)); and Doc. 126-9 (Ex. M at ¶ 5 (Papac Decl.)).  Defendants assert that with a few exceptions, every time an inmate leaves the housing area to an administrative area (which contains offices for education, medical services, dental services, laundry, kitchen, canteen dining room, law library, receiving and release, chapels and other administrative offices), the inmate must undergo a pat down search for security purposes.  Doc. 126-1 at 11 (MSJ).  As evidence, Defendants cite to the declarations of Defendants Barker, Chappel, Howard, Johnson, Meadors and Papac.  Doc. 126-6 (Ex. F at ¶¶ 6-7 (Barker Decl.)); Doc. 126-6 (Ex. G at ¶¶ 6-7 (Chappel Decl.)); Doc. 126-9 (Ex. I at ¶¶ 6-7 (Howard Decl.)); Doc. 126-9 (Ex. J at ¶¶ 6-7 (Johnson Decl.)); Doc. 126-9 (Ex. L at ¶¶ 6-7 (Meadors Decl.)); and Doc. 126-9 (Ex. M at ¶¶ 6-7 (Papac Decl.)).  Defendants point out that in his deposition, Plaintiff admits

---

[1] Defendants first argue that Plaintiff had failed to exhaust administrative remedies with regards to his retaliation claim stemming from excessive body searches.  (Doc. 126-2 at 11).  However, the Court's first scheduling order set the deadline to file unenumerated 12(b) motions for September 19, 2007.  The Court's subsequent amendments to the scheduling order and extensions never extended the deadline for unenumerated 12(b) motions. (Docs. 65, 84).  Therefore, the Court will not entertain Defendants' untimely unenumerated 12(b) motion to dismiss on exhaustion grounds.

that he had to go to the administrative side of the prison every day for chow, work, the law library and chapel. Doc. 126-1 at 11 (MSJ); Doc. 126-7 (Ex. H-24 at 61:22-62:3 (Plaintiff's Deposition)).

Additionally, Defendants argue that some of the defendants did not hold positions that would entail conducting frequent pat-down searches or any pat-down searches at all. Doc. 126-1 at 12 (MSJ). Plaintiff states in his deposition that for a ten month period in 2002, Defendants Howard, Johnson, Papac, Meadors, and Winett conducted ten to fifteen pat-down searches on Plaintiff every day, while Defendants Barker and Chappel conducted three to five pat-down searches every day. Doc. 126-1 at 11 (MSJ); Doc. 126-7 (Ex. H-24 at 39:16-19; 64:8-65:11; 65:14-66:18; 67:20-68:24; 69:14-70:13 (Plaintiff's Deposition)). Defendants argue that since Defendants Howard, Johnson and Barker are in the position of Correctional Sergeant, pat-down searches would not normally be within the scope of their normal duties. Pat-down searches were delegated to correctional officers unless a disturbance on the yard required additional assistance. Doc. 126-1 at 12 (MSJ). As evidence, Defendants cite to the declarations of Defendants Barker, Howard and Johnson. Doc. 126-6 (Ex. F at ¶ 4 (Barker Decl.)); Doc. 126-9 (Ex. I at ¶ 4 (Howard Decl.)); Doc. 126-9, Ex. J at ¶ 4 (Johnson Decl.)). Further, Defendants state that since Defendant Winett began his career as a correctional administrator, he never conducted a pat-down search on any inmate in his entire career. Doc. 126-1 at 12 (MSJ). As evidence, Defendants cite to Defendant Winett's declaration. Doc. 126-9 (Ex. P at ¶ 4 (Winett Decl.)).

Additionally, Defendants argue that Plaintiff fails to show that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the defendants' alleged adverse actions. Doc. 126-1 at 27-28 (MSJ). Defendants assert that although Plaintiff alleges that Defendants Howard, Johnson, Barker, Chappel, Papac, Meadors, and Winett conducted excessive pat-down searches in retaliation for Plaintiff's prior litigation against CDCR and for filing a

complaint against Officer Sutherland, in each of their declarations, Defendants state that they were

not aware of any grievance filed against Officer Sutherland.[2]  Further, Defendants point out that

Plaintiff states in his deposition that he was not physically injured or harmed as a result of the pat-

down searches.  Doc. 126-1 at 12 (MSJ); Doc. 126-7 (Ex. H-24 at 66:8-10 (Plaintiff's Deposition)).

Finally, Defendants assert that Plaintiff cannot demonstrate that Defendants' conduct chilled

his first amendment exercise given that Plaintiff has filed approximately twenty appeals since the

alleged retaliatory pat-downs started in 2002 and Plaintiff states in his deposition that he could

appeal whenever there was an issue that adversely affected him and that he 'take[s] that right every

chance [he] get[s].'  Doc. 126-1 at 28 (MSJ); Doc. 126-7 (Ex. H-24 at 191:14-20 (Pltf's Dep.)).

### 3.   **Plaintiff's Opposition**

Plaintiff concedes that he did not exhaust administrative remedies on this claim and does not

put forth any counter arguments or evidence to challenge Defendants' motion for summary judgment

on this claim.

### 4.   **Legal Standard and Analysis**

A viable claim for First Amendment retaliation contains five basic elements: (1) an assertion

that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's

protected conduct and that such action (4) chilled the inmate's exercise of his First Amendment

rights (or that the inmate suffered more than minimal harm) and (5) the action did not reasonably

advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005);

*accord  Nevada Dept. of Corrections v. Greene*, --- F.3d ----, 2011 WL 3559955 at *2 (9th Cir.

2011) ("A viable claim for retaliation requires, in part, that an inmate demonstrate that the prison

officials' adverse action does not reasonably advance a legitimate correctional goal.").  To raise a

---

[2] However, they do not address whether they had knowledge of any other litigation pursued by Plaintiff.

triable issue as to causation, Plaintiff "need only put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendant's] intent . . . ." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).   However, conclusory allegations of retaliatory intent cannot defeat summary judgment.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).  Filing prison grievances and court action is protected conduct, *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003), and even the mere threat of harm can be sufficiently adverse to support a retaliation claim, *Brodheim*, 584 F.3d at 1270.

Defendants conceded that Plaintiff was subjected to frequent pat-down searches.  However, Defendants assert that such searches were routine and applied equally to all prisoners leaving and returning to their cells, in other words, that Plaintiff was not targeted for any extra pat-down searches.  Doc. 126-1 at 11 (MSJ).  Defendants also assert that the routine pat-down searches are a necessary security measure to ensure that inmates are not bringing contraband, weapons, or other unapproved items into a particular area, thereby protecting the safety and security of the institution. Doc. 126-1 at 11 (MSJ).  A prisoner's First Amendment rights exist to the extent that such rights are not inconsistent with the status of being a prisoner.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (conduct that reasonably advances a legitimate correctional goal defeats a retaliation claim).

Although excessive strip searches may be unconstitutional, repeated routine pat-down searches as a prisoner repeatedly goes back and forth between his cell and administrative or community areas of the prison do not demonstrate the existence of an adverse action.  *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (requiring adverse action); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir.1988) (strip searches as an example of adverse action).  Plaintiff does not provide any evidence to demonstrate that Plaintiff is being particularly targeted for more

pat-down searches than other prisoners similarly moving throughout the prison, nor does Plaintiff

offer proof that the named defendants were aware of his grievance and litigation history.

Based on the above, the Court concludes that Plaintiff fails to state a retaliation claim based

on a theory of retaliatory repeated routine pat-down searches.

**B.** **Claim 2: RLUIPA and Free Exercise Claim Regarding Confiscation of Kosher**

**Food Package**

**1.** **Plaintiff's Allegations in Amended Complaint**

Plaintiff is a Black Orthodox Jewish prisoner.  Doc. 42 at 13.  Plaintiff alleges that on

December 6, 2002, Defendants Winett, Meadors, Barker, and Woodley confiscated his kosher food

package, in violation of RLUIPA and the Free Exercise Clause.  Doc. 42 at 14; Doc. 44 at 5.

Plaintiff alleges that he was deprived of his ability to eat kosher food for Hanukkah, which he alleges

is mandated by his faith.  Doc. 42 at 14; Doc. 44 at 5.  Plaintiff alleges that he served notice on

defendants Calderon, Vazquez, Grannis, and Alameida, but they refused to intervene and on

February 6, 2003, concurred with the confiscation of his package.  Doc. 42 at 14; Doc. 44 at 5.  The

Court screened the complaint and allowed the case to proceed against Defendants Winett, Meadors,

Barker, and Woodley for violation of the Free Exercise Clause and RLUIPA.  Doc. 44 at 6-7.

**2.** **Defendants' Motion for Summary Judgment**

**a.** **Free Exercise Clause**

It is undisputed that Plaintiff is a Black Orthodox Jewish prisoner.  Defendants assert that

at the time relevant to Plaintiff's claims, CCI did not have an institutional-wide kosher food program.

Doc. 126-1 at 13, 31 (MSJ); Doc. 126-9 (Ex. P at ¶ 6 (Winett Decl.)); Doc. 126-9 (Ex. Q at ¶ 4

(Woodley Decl.)).  Defendants argue that Plaintiff's claim fails to meet the four factors set out in

*Turner v. Safley*, 482 U.S. 78, 89-91 (1987).  Doc. 126-1 at 31 (MSJ).  Defendants argue that Plaintiff cannot prevail because the nature of incarceration and the implementation of valid penological objectives necessarily limit the extent of a prisoner's free exercise rights and prison officials did their best to accommodate Plaintiff's religious requests.  Doc. 126-1 at 13, 31 (MSJ).

Defendants assert that on or around December 6, 2002, prison officials made special arrangements for Plaintiff to consume some of the items contained in two kosher food packages that had a combined weight of approximately ninety pounds.  Doc. 126-1 at 13, 31 (MSJ); Doc. 126-7 (Ex. H-24 at 97:1-15, 116:9-12 (Pltf's Dep.)); Doc. 126-6 (Ex. F at ¶ 14 (Barker Decl.)); Doc. 126-9 (Ex. L at ¶ 13 (Meadors Decl.)); Doc. 126-9 (Ex. P at ¶ 8 (Winett Decl.)); Doc. 126-9 (Ex. Q at ¶ 6 (Woodley Decl.)).  Defendants argue that their inmate property policy ("OP 206") prohibited inmates from possessing personal belongings that exceeded six cubit feet and property rules further prohibited inmates from having packages exceeding thirty pounds in weight.  Doc. 126-1 at 31 (MSJ); Doc. 126-6 (Ex. F at ¶¶ 18, 20 (Barker Decl.)); Doc. 126-9 (Ex. Q at ¶¶ 8-9 (Woodley Decl.)).  Defendants assert that, although the prison policy restricting prisoner property may infringe on Plaintiff's religious exercise right, the policy is valid under *Turner*, since there is a rational basis for the policy to achieve a legitimate, neutral government objective.  Doc. 126-1 at 31 (MSJ).

Defendants state that the inmate property policy restricting the amount of personal property is aimed to reduce fire hazards, security risks and sanitation problems.  Doc. 126-1 at 31 (MSJ).  As evidence, Defendants cite to the declarations of Defendants Barker, Chappel and Woodley.  Doc. 126-6 (Ex. F at ¶¶ 17-21 (Barker Decl.)); Doc. 126-6 (Ex. G at ¶¶ 12-13 (Chappel Decl.)); Doc. 126-9 (Ex. Q at ¶¶ 7-10 (Woodley Decl.)).  According to Defendant Woodley's declaration, in addition to creating a fire hazard and potential sanitation problems, unregulated personal property can also create security risks by creating an environment in which inmates sell excess items on the

black market; hindering prison officials from efficiently searching an inmate's cell for weapons or contraband, when necessary; or preventing an inmate from escaping a cell quickly in the event of an emergency.  Doc. 126-9 (Ex. Q at ¶¶ 7-10 (Woodley Decl.)).

Moreover, Defendants assert that prison officials made accommodations for his religion, that Plaintiff was able to observe the practices of his religion and that the property policy did not pose an unreasonable burden to the practice of his religion.  Doc. 126-1 at 13, 32-33 (MSJ).  While at CCI, Plaintiff consumed a vegetarian diet in CCI's Alternate Diet Program, which Plaintiff considered to be kosher.  Doc. 126-7 (Ex. H-24 at 109:15-23; 112:9-24, 113:11-25 (Pltf's Dep.)).  Further, Plaintiff concedes that besides not receiving his kosher food package in December 2002, he was able to attend Jewish religious services during Hanukkah in 2002, pray daily, study the Torah, and observe the Shabbat.  Doc. 126-1 at 13, 32-33 (MSJ); Doc. 126-7 (Ex. H-24 at 113:25-114:22 (Pltf's Dep.)).

Next, Defendants argue that Plaintiff fails to demonstrate how Defendant Barker was involved in the decision to confiscate his kosher food package, and that Plaintiff cannot prevail in summary judgment since Plaintiff fails to set forth specific facts showing how each and every defendant actually and proximately caused the deprivation of a federally protected right.  Doc. 126-1 at 33 (MSJ); Doc. 126-7 (Ex. H-24 at 105:1-5 (Pltf's Dep.)).

Finally, Defendants argue that they are entitled to qualified immunity for Plaintiff's First Amendment free exercise claim since: 1) at the time relevant to the claim, there was not an institutional-wide kosher food program at CCI and; 2) at that time, it was not clearly established that confiscation of Plaintiff's kosher food package would constitute a violation when prison officials did their best to accommodate Plaintiff's dietary needs through a vegetarian diet.  Doc. 126-1 at 41 (MSJ).

1

### b.   **RLUIPA**

Defendants argue that Plaintiff cannot recover monetary damages under the Religious Land Use and Institutionalized Persons Act (RLUIPA).  Doc. 126-1 at 33-35 (MSJ).  Defendants assert that under RLUIPA, Plaintiff has failed to meet the initial burden of presenting a prima facie claim that the challenged state action constitutes a substantial burden on the exercise of his religious beliefs. Doc. 126-1 at 34 (MSJ) (citing *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005)).  Even if Plaintiff were to meet his initial burden, Defendants argue that Plaintiff's claim fails since the property regulation serves a compelling government interest and the policy is the least restrictive means of achieving that interest.  Doc. 126-1 at 34, 36 (MSJ) (citing *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  Defendants further argue that a RLUIPA claim seeking monetary damages against defendants in their official capacity is barred by sovereign immunity.  Doc. 126-1 at 34-35 (MSJ) (citing *Holley v. California Dept. of Corr.*, 599 F.3d 1108, 1114 (9th Cir. 2010)).  Further, Defendants argue that RLUIPA only permits injunctive and declaratory relief and since Plaintiff was transferred to another prison and CDCR now offers a system-wide kosher food program, obtaining declaratory and injunctive relief is moot.  Doc. 126-1 at 35-36 (MSJ).

As with Plaintiff's First Amendment free exercise claim, Defendants finally argue that they are entitled to qualified immunity for Plaintiff's RLUIPA claim since: 1) at the time relevant to the claim, there was not an institutional-wide kosher food program at CCI and; 2) at that time, it was not clearly established that confiscation fo Plaintiff's kosher food package would constitute a violation when prison officials did their best to accommodate Plaintiff's dietary needs through a vegetarian diet.  Doc. 126-1 at 41 (MSJ).

///

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3.    Plaintiff's Opposition

Plaintiff reasserts allegations previously made in his complaint regarding the confiscation of his kosher food package and asserts that such confiscation substantially burdened Plaintiff's practice of his religion.  Doc. 144 at 7-8.  Plaintiff concedes that the packages had a combined weight of about ninety pounds.  Doc. 144 at 7.  Plaintiff alleges that Defendants did not follow the property policy and procedure "O.P. 206" and under section 3190(h)(4) of Title 15 of the California Code of Regulations, there is no set weight limit.  Doc. 144 at 7-8; Doc 145 at ¶¶ 1, 9; Doc. 146 at 7-9, 25 (Exhibit 1).  Plaintiff asserts that Defendants "did not go out of their way to accommodate Plaintiff['s] religious request."  Doc. 145 at 3.

In response to Plaintiff's motion for summary judgment, Plaintiff argues that he should be able to recover monetary damages against Defendants under RLUIPA because they can be sued in their individual capacities and that the Ninth Circuit has yet to decide the issue of whether one can be sued in their individual capacity under RLUIPA.  Doc. 144 at 8.  Plaintiff also argues that Defendants are not entitled to qualified immunity for the RLUIPA and First Amendment free exercise claims since Defendants' conduct violated clearly established statutory and constitutional rights.  Doc. 144 at 11.

### 4.    Legal Standard and Analysis

#### a.    First Amendment Free Exercise

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const., amend. I.  Prisoners "retain protections afforded by the First Amendment," including the free exercise of religion.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *accord Turner v. Safley*, 482 U.S. 78, 84 (1987); *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).  "Thus, [a]

12

prisoner retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Ashker v. California Dep't Of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003) (internal citations and quotations omitted). "A prison regulation that impinges on inmates' constitutional rights therefore is valid only if it is 'reasonably related to legitimate penological interests.'" *Ashker*, 350 F.3d at 922 (quoting *Turner*, 482 U.S. at 88). "A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89.

However, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner*, 482 U.S. at 84 (internal quotations and citations omitted). Thus, "'deference is accorded to prison authorities in order to avoid hampering their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,'" *Ashker*, 350 F.3d at 922 (quoting *Turner*, 482 U.S. at 85, 88), and the regulation must be upheld if it is reasonably related to legitimate penological interests. *Mauro v. Arpaio*, 188 F.3d 1054, 1058 (9th Cir. 1999) (citing to *Turner*, 482 U.S. at 84-85 (internal quotations omitted)).

In accordance with *Turner*, the Court applies a four part balancing test to determine whether a prison regulation is reasonably related to legitimate penological interests:

> (1) Whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it";
>
> (2) Whether there are "alternative means of exercising the right that remain open to prison inmates";
>
> (3) Whether "accommodation of the asserted constitutional right" will "impact ... guards and other inmates, and on the allocation of prison resources generally"; and
>
> (4) Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

*Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) (citing *Turner*, 482 U.S. at 89-90).

> In determining whether there is a rational relationship between the purported objective and the regulation, the level of scrutiny applied to the judgment of prison officials depends on the circumstances in each case.  If an inmate presents sufficient evidence to refute a common-sense connection between a legitimate objective and a prison regulation, ... the state must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational."  If, however, the inmate does not present evidence sufficient to refute a common-sense connection between the regulation and the government objective, prison officials need not prove that the banned material actually caused problems in the past or that the materials are likely to cause problems in the future.  The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests.

*Ashker* at 922-23 (internal quotations and citations omitted).

Defendants provide reasonable and legitimate purposes to have policies which restrict a prisoner from receiving packages exceeding thirty pounds and restrict a prisoner from keeping excess perishables and property beyond six cubit feet.  The relevant prison property policy restricts the amount of personal property possessed by prisoners and Defendants assert such policy is for the purpose of promoting a safe environment for staff and inmates by reducing fire hazards, security risks and sanitation problems.  Moreover, the Court agrees with Defendants that unregulated personal property can also create security risks by presenting an opportunity for inmates to sell excess items on the black market; hindering prison officials from efficiently searching an inmate's cell for weapons or contraband; or preventing an inmate from escaping a cell quickly in the event of an emergency.  Although Plaintiff alleges that Defendants did not follow the property policy and procedure "O.P. 206," the policy he attaches does not support his argument since his exhibit states "Property in excess of what is permitted at the institution may be sent out by the inmate at his own expense or may be donated to the institution for disposal according to institutional procedures." Doc. 146 at 9 (Exhibit 1).  A fair reading of Plaintiff's Exhibit 1 suggests that there is an amount of

property that could be deemed "in excess of what is permitted" and Plaintiff does not put forth any evidence to suggest that two packages amounting to ninety pounds is not in excess.

Moreover, Defendants accommodated Plaintiff in December 2002 by making special arrangements for Plaintiff to consume some of the items contained in the two kosher food packages that had a combined weight of approximately ninety pounds.  As Defendants point out, Plaintiff concedes although he did not receive his kosher food package in December 2002, he was able to consume a vegetarian diet in CCI's Alternate Diet Program, which Plaintiff considered to be kosher.  Therefore, Plaintiff fails to demonstrate how the confiscation of two kosher food packages violates his constitutional right to practice his religion.

Finally, Plaintiff fails to adequately link Defendant Barker to specific conduct that deprived Plaintiff of his rights.  Section 1983 plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff.  *See Monell v.  Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution .
> . . shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983.  The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  In order to state a claim for relief under section 1983, Plaintiff must link each

named defendant with some affirmative act or omission that demonstrates a violation of Plaintiff's federal rights.  In this instance, Plaintiff fails to demonstrate how Defendant Barker was involved in the decision to confiscate his kosher food package.

Based on the foregoing, the Court concludes that Plaintiff has failed to state a cognizable First Amendment Free Exercise claim against Defendants Winett, Meadors, Barker, and Woodley. Therefore, the Court will not reach Defendants' qualified immunity argument for this claim.

### b.    RLUIPA

RLUIPA prohibits prison officials from substantially burdening a prisoner's religious exercise "unless the burden furthers a compelling governmental interest and does so by the least restrictive means." *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2009) (internal quotation marks and citation omitted).  As noted above, Plaintiff fails to demonstrate how the confiscation of two kosher food packages created a substantial burden on the exercise of his religion when he was still able to maintain a vegetarian diet which he considered to be kosher.

Furthermore, a claim pursuant to RLUIPA is limited to seeking declaratory or injunctive relief. *Sossamon v. Texas*, ___ U.S. ___, ___, 131 S.Ct. 1651, 1663 (2011); *Holley v. California Dept. of Corrections*, 599 F.3d 1108, 1114 (9th Cir. 2010).  Plaintiff's claim is premised on the past violation of his rights via a one-time confiscation of two religious packages.  Because Plaintiff is no longer incarcerated at CCI and his claim arose from a one-time incident, he lacks standing to pursue a claim for injunctive relief. *Summers v. Earth Island Institute*, 555 U.S. 488, ___, 129 S.Ct. 1142, 1149 (2009); *Mayfield v. United States*, 599 F.3d 964, 969-73 (9th Cir. 2010); *Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001), or for declaratory relief, *Feldman v. Bomar*, 518 F.3d 637, 642 (9th

Cir. 2008); *Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989).

Based on the foregoing, Plaintiff fails to state a cognizable RLIUPA claim against Defendants Winett, Meadors, Barker, and Woodley stemming from the confiscation of the two kosher packages.

### C.     Claims 3 and 4: Retaliation and Eighth Amendment Claims Resulting from the X-ray and Contraband Watch

####         1.     Plaintiff's Allegations in Amended Complaint

Plaintiff alleges that on December 11, 2002, he and Defendant Calderon (Warden at CCI) got into an argument concerning his grievance over the confiscation of his kosher food package. The fact that this argument occurred is supported by Plaintiff's Rules Violation Report ("RVR") delivered by Defendant Howard for disrespect towards staff. Doc. 146 (Plaintiff's Exhibit 40); Doc. 126-7 (Defendants' Ex. H, Gatling Decl., at ¶ 2, Ex. 24 at 132:9-14; Doc. 126-8 (Ex. 25 (RVR)). The RVR states that Plaintiff was placed in Administrative Segregation as a result of Plaintiff's cursing and yelling at Warden Calderon to leave the unit. Doc. 126-8 (Defendants' Ex. 25 (RVR)). Plaintiff alleges that Calderon slurred him by saying, "You people are always complaining." Doc. 42 at 15; Doc. 44 at 7-8. Plaintiff alleges he was taken to the medical clinic where Defendants Calderon (Warden), Winett (Associate Warden), Meadors, Papac, Howard, and Johnson forced him to have an unnecessary body x-ray in retaliation for standing up for his right to exercise his religion. Doc. 42 at 15-16; Doc. 44 at 7-8. Plaintiff alleges that Defendants Vo and Kordan retaliated against him by falsifying the medical report to incorrectly state that Plaintiff had rectal contraband. Doc. 42 at 16; Doc. 44 at 8. According to Plaintiff, as a result of the purposefully erroneous x-ray reading, Plaintiff was placed in punitive segregation on contraband status. Doc. 42 at 16; Doc. 44 at 8.

As Plaintiff was on contraband watch, Defendant Reed: 1) forced Plaintiff to remove his pants, shirt, and shoes, and; 2) placed Plaintiff in full mechanical restraints, a waist chain, handcuffs, and leg irons.  Doc. 42 at 16; Doc. 44 at 8.  Plaintiff alleges that: 1) he was dressed only in a t-shirt, boxer shorts, and shower shoes, and; 2) was placed in a holding cell the size of a telephone booth and made of metal mesh.  Doc. 42 at 16; Doc. 44 at 8.  Plaintiff alleges he was freezing cold, and defendants Mack, Reed, and Traynham denied his numerous requests for clothing and a blanket.  Doc. 42 at 16-17; Doc. 44 at 8.  Plaintiff alleges he told Defendant Mack he would commit suicide to stop the freezing cold.  Doc. 42 at 17; Doc. 44 at 8.

According to Plaintiff, Defendants Reed, Mack, and Traynham subsequently placed Plaintiff in a freezing strip cell with fecal matter on the walls, floor and bunks, and with no heat, no running water, no mattress, no blanket, and no cleaning supplies for three days.  Doc. 42 at 17; Doc. 44 at 8.  Plaintiff alleges he went on a hunger strike and on the third day was given another x-ray, which cleared him of having rectal contraband.  Doc. 42 at 17-18; Doc. 44 at 8.

The Court screened the complaint and allowed the case to proceed against Defendants Calderon, Winett, Meadors, Papac, Howard, Johnson, Vo, and Kordan for retaliation and against Reed, Mack, and Traynham for violation of the Eighth Amendment.  Doc. 44 at 8.

### 2.   Defendants' Motion for Summary Judgment (MSJ)

#### a.   MSJ for Retaliation

Defendants argue that Plaintiff cannot establish the essential element that the named Defendants actually took an adverse action against Plaintiff since Defendants were not responsible for the decision to x-ray Defendant.  Doc. 126-1 at 28-29 (MSJ).  Defendants argue that Winett, Meadors, Papac, Howard, and Johnson's only involvement consisted of being present in the holding area in preparation for the x-ray.  Doc. 126-1 at 28 (MSJ).  As evidence, Defendants cite to

Plaintiff's deposition. Doc. 126-7 ( Ex. H-24 at 145:10-13; 148:17-149:1; 151:4-12; and 151:13-20 (Plaintiff's Deposition)). Moreover, Defendants assert that based on their positions, Defendants Howard, Johnson, and Papac cannot order an x-ray for an inmate. Doc. 126-1 at 28 (MSJ); Doc. 126-9 (Ex. M at ¶ 9 (Papac Decl.)); Doc. 126-9 (Ex. I at ¶ 9 (Howard Decl.)); Doc. 126-9 (Ex. J at ¶ 9 (Johnson Decl.)). Moreover, Defendants argue, that it is not within the normal practice of Defendants Winnett (Associate Warden) and Calderon (Warden) to be involved with the day-to-day decisions affecting any particular inmate. Doc. 126-1 at 28-29 (MSJ); Doc. 126-9 (Ex. P at ¶ 9 (Winett Decl.)); Doc. 126-6 (Ex. E at ¶¶ 6-7 (Calderon Decl.)). With regards to Defendant Meadors, Defendants argue that five days before the x-ray was ordered, Meadors was re-assigned to a different unit from Plaintiff's and Defendant Meadors did not authorize nor was involved in the decision to require Plaintiff to undergo an x-ray on December 11, 2002. Doc. 126-1 at 29 (MSJ); Doc. 126-9 (Ex. L at ¶ 16 (Meadors Decl.)). Further, Defendants argue that Plaintiff fails to demonstrate that the x-ray to determine the presence of contraband did not reasonably advance a legitimate correctional goal. Doc. 126-1 at 29 (MSJ).

Defendants assert that Plaintiff's x-ray was a result of security concerns arising from an incident on December 6, 2002, where numerous inmates in his unit refused to return to their cells and there existed reasonable suspicion that some of the inmates (including Plaintiff) possessed contraband weapons. Doc. 126-1 at 29 (MSJ). Defendants state that Dr. Vo ordered an x-ray of Plaintiff's abdomen on December 11, 2002, solely for the purpose of ruling out contraband. Doc. 126-1 at 29 (MSJ). As evidence, Defendants cite to the declaration of Dr. Vo, the declaration of a non-party witness, Dr. Sepulveda and Plaintiff's deposition. Doc. 126-6 (Ex. C at ¶ 6 (Vo Decl.)); Doc. 126-6 (Ex. D at ¶¶ 6, 8 (Sepulveda Decl.) and Ex. 20); Doc. 126-7 (Ex. H-24, at 138:17-20

(Pltf's Dep.)).  Defendants also note that Plaintiff consented to the x-ray.  Doc. 126-1 at 29 (MSJ);

Doc. 126-7 (Ex. H-24, at 136:7-8 (Pltf's Dep.)).

Defendants argue that contrary to Plaintiff's assertions, the fact that the second x-ray did not

demonstrate any evidence of contraband does not negate that there was reasonable suspicion to

warrant the x-rays in the first place.  Doc. 126-1 at 29 (MSJ).  According to Dr. Sepulveda, Dr.

Kordan's notes concluded that the x-ray taken on December 11, 2002, revealed an abnormal mass

or foreign object in Plaintiff's rectal area.  Doc. 126-6 (Ex. D at ¶ 9 (Sepulveda Decl.)).  Dr.

Sepulveda, observes that the medical records indicate that the x-ray taken on December 13, 2002,

revealed no evidence of contraband.  Doc. 126-6 (Ex. C at ¶ 9 (Vo Decl.)); Doc. 126-6 (Ex. D at ¶

11 (Sepulveda Decl.) and Ex. 21).

Defendants argue that there are several explanations for why the second x-ray did not reveal

evidence of contraband.  Doc. 126-1 at 29 (MSJ).  According to Dr. Sepulveda, x-rays are not 100

percent accurate in detecting abnormalities or contraband in an individual's abdominal cavity.  Doc.

126-1 at 29 (MSJ); Doc. 126-6 (Ex. D at ¶ 11 (Sepulveda Decl.) and Ex. 21)).  Dr. Sepulveda further

explains that the abnormality initially seen on the December 11, 2002-x-ray, but not seen on the

x-ray taken on December 13, 2002, could result from a number of causes, including but not limited

to: 1) the person's normal gases indicated by a blurry area on the x-ray film; 2) an abnormality seen

because of something the individual ate or ingested prior to the scan; 3) the accuracy of the x-ray,

depending on the skill of the technician administering the scan or the cooperation of the patient

during the scan; or 4) the ability of the individual to pass the foreign body in the interim without

being detected by security measures.  Doc. 126-1 at 29-30 (MSJ); Doc. 126-6 (Ex. D at ¶ 14

(Sepulveda Decl.)).

Defendants argue that Plaintiff fails to present any evidence that the x-ray on December 11, 2002, was unnecessary other than his non-medical explanation of the second x-ray and speculation regarding different penmanship on the December 11, 2002, order.  Doc. 126-7 (Ex. H-24, at 138:24-140:11, 159:18-163:9-25 (Plaintiff's Deposition)).

As with the pat-down retaliation argument, Defendants argue that Plaintiff fails to demonstrate that Defendants made him take an x-ray *because* Plaintiff engaged in protected conduct since Defendants did not have any independent, personal knowledge of the specific circumstances surrounding Plaintiff's disagreement with Warden Calderon or his staff complaint against Officer Sutherland.  Doc. 126-1 at 30 (MSJ).  Defendants also apply the same argument as in the above pat-down retaliation issue that Plaintiff cannot establish that Defendants chilled his First Amendment rights given his litigation history after the alleged retaliatory conduct and Plaintiff's deposition indicating that he could and would file a grievance whenever he felt the need.  Doc. 126-1 at 30 (MSJ).

### b.    MSJ for Eighth Amendment Claim

Defendants argue that their actions in implementing the contraband watch was justified and in accordance with prison procedures.  Doc. 126-1 at 37 (MSJ).  Defendants assert that because there was reasonable suspicion that Plaintiff possessed contraband and his body x-ray gave additional affirmation of the presence of contraband, he was placed on contraband watch.  Doc. 126-1 at 38 (MSJ); Doc. 126-9 (Ex. K at ¶ 5 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶ 4 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶ 4 (Traynham Decl.)); Doc. 126-7 (Ex. H-24 at 164:21-24; (Pltf's Dep.)); Doc. 126-7 (Ex. 25 (CDC 114D)).  Defendants argue that the following procedures were necessary once an inmate is suspected of swallowing contraband: 1) restricting an inmate to only having a pair of boxer shorts, a t-shirt and shower shoes; 2) restraining inmate in waist chains, handcuffs, and leg irons; and 3)

placing inmate in a cell with no heat, running water, mattress, blanket, or cleaning supplies.  Doc. 126-1 at 38 (MSJ); Doc. 42 at 16:21-23, 17:18-20 (Pltf's Cmplt.); Doc. 126-7 (Ex. H-24 at 169:22-24, 170:22-24 (Pltf's Dep.); Doc. 126-9 (Ex. K at ¶¶ 7-8 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶¶ 7-8 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶¶ 7-8 (Traynham Decl.)); Doc. 126-7 ( Ex. H-26 ).  Defendants concede that Plaintiff underwent the above described procedures of contraband watch.  Defendants argue that Plaintiff cannot prove the objective prong of deliberate indifference since Plaintiff cannot demonstrate that the deprivation is sufficiently serious.  Doc. 126-1 at 37 (MSJ) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Further, Defendants assert that Plaintiff cannot prove the subjective prong of deliberate indifference since Plaintiff fails to demonstrate that Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety.  Doc. 126-1 at 37 (MSJ) (citing *Farmer v. Brennan*, 511 U.S. 825, 837).  Defendants argue that being at a comfortable temperature is not a right recognized by the courts, nonetheless, the Ad-Seg Unit is heated when necessary in order to keep the temperature at a comfortable level for both inmates and staff within the facility. Doc. 126-1 at 38 (MSJ); Doc. 126-9 (Ex. K at ¶ 6 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶ 6 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶ 6 (Traynham Decl.)).

Although Plaintiff alleges that he was placed in a feces-covered cell, Defendants assert that prior to any inmate being placed in a new Ad-Seg cell, it is required to be cleaned and inspected to ensure that it is suitable to house an incoming inmate.  Doc. 126-1 at 38 (MSJ); Doc. 126-9 (Ex. K at ¶ 13 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶ 13 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶ 13 (Traynham Decl.)).  Defendants assert that during the entire time they have worked in CCI's Ad-Seg Unit, none have ever seen an inmate placed into a cell covered with feces, nor have ever placed, or authorized an inmate to be placed, in a feces-covered cell.  Doc. 126-1 at 38 (MSJ); Doc. 126-9 (Ex. K at ¶ 14 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶ 14 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶ 14

(Traynham Decl.)). If a cell were covered in feces, Defendants assert that they would either immediately correct the situation prior to the inmate being placed into the cell or find another cell for the inmate.  Doc. 126-1 at 38 (MSJ); Doc. 126-9 (Ex. K at ¶ 14 (Mack Decl.)); Doc. 126-9 (Ex. N at ¶ 14 (Reed Decl.)); Doc. 126-9 (Ex. O at ¶ 14 (Traynham Decl.)).

### 3.    Plaintiff's Opposition

### a.    Opposition Regarding Retaliation

Plaintiff states that he was never suspected of having any contraband missing wood or metal on December 6, 2002, or on December 11, 2002, however Defendant Calderon still ordered for Plaintiff to be placed in administrative segregation and on contraband watch.  Doc. 144 at 4. Plaintiff asserts that Defendant Calderon lied about ordering Plaintiff to go into administrative segregation and asserts that Plaintiff can prove it.  Doc. 144 at 4.  According to Plaintiff, Dr. Vo and Dr. Kordan falsified the December 11, 2002, x-ray of Plaintiff which indicated that contraband may be present.  Doc. 144 at 4-5.  Plaintiff's evidence that Dr. Vo and Dr. Kordan falsified Plaintiff's x-ray results stems from the fact that the second x-ray was inconclusive and Plaintiff did not have a bowel movement prior to the second x-ray.  Doc. 145 at ¶ 24.  Plaintiff argues that since the second x-ray revealed no evidence of contraband and Plaintiff did not have a bowel-movement within the three days of contraband watch, that Defendants were not justified in implementing the contraband watch and requiring x-rays in the first instance.  Doc. 144 at 5.

Plaintiff further argues that Defendants have no evidence that Plaintiff was ever suspected of possessing any contraband and no evidence that they followed the CDCR policies and procedure concerning giving a prisoner a contraband x-ray.  Doc. 144 at 5-6.  Plaintiff states that he saw Defendants Calderon, Winnett, Meadors, Papac, Howard and Johnson in the holding area where he was on contraband watch and that all of these defendants told Plaintiff that he had to take the x-ray.

As in his complaint, Plaintiff asserts that as a result of the "heated argument" with Defendant Calderon, Defendant Calderon ordered a rules violation, administrative segregation and contraband procedures under the false pretext that Plaintiff was suspected of having contraband.  Doc. 144 at 6.

In Plaintiff's statement of undisputed facts, Plaintiff asserts that Defendants knew of Plaintiff's litigation against CDCR and his complaint against officer Sutherland and lists as evidence: 1) the inmate appeal log; 2) legal letters that he wrote; 3) David Sutherland's declaration and request to withdraw declaration as filed in error; and 4) other documents demonstrating that he has filed complaints and is pursuing legal action.  Doc. 145 at ¶ 10.  Further, Plaintiff asserts that there is no evidence that any correctional officer identified him as refusing to return to his cell on Friday December 6, 2002 (the day of the incident giving rise to suspicion of contraband among various inmates).  Doc. 145 at ¶ 17; Doc. 146 (Exhibit 7 at 14-15 (Plaintiff's Declaration)).

### b.     Opposition Regarding Cruel and Unusual Punishment

Plaintiff reasserts that he was intentionally placed in a cell covered in feces from December 11, 2002, to December 13, 2002, and during this time Defendants demonstrated deliberate indifference to his cell conditions and medical needs.  Doc. 144 at 9-10.  Plaintiff also asserts that during December 2002, the contraband watch cell was "freezing cold."  Doc. 145 at ¶ 29; Doc. 146 at 221-228 (Declarations of inmates Hunnicutt, McCray and Hasan at ¶ 2).  Although Plaintiff mentioned in his complaint that he went on a hunger strike for three days while on the contraband watch, Plaintiff alleges for the first time in his opposition that his constitutional rights were violated because he was not seen by a doctor for treatment of his hunger strike while on contraband watch.  Doc. 42 at 17 (Complaint); Doc. 145 at ¶ 31-32.

///

1

2

3

4      **4.     Legal Standard and Analysis**

5          **a.     Retaliation**

6      A viable claim for First Amendment retaliation contains five basic elements: (1) an assertion

7  that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's

8  protected conduct and that such action (4) chilled the inmate's exercise of his First Amendment

9  rights (or that the inmate suffered more than minimal harm) and (5) the action did not reasonably

10 advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005);

11 *accord  Nevada Dept. of Corrections v. Greene*, --- F.3d ----, 2011 WL 3559955 at *2 (9th Cir.

12 2011) ("A viable claim for retaliation requires, in part, that an inmate demonstrate that the prison

13 officials' adverse action does not reasonably advance a legitimate correctional goal.").  To raise a

14 triable issue as to causation, Plaintiff "need only put forth evidence of retaliatory motive, that, taken

15 in the light most favorable to him, presents a genuine issue of material fact as to [defendant's] intent

16 . . . ." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009).  However, conclusory allegations of

17 retaliatory intent cannot defeat summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th

18 Cir.1989).

19          **i.     Adverse Action/Chilling**

20     A contraband procedure involving a purposefully misinterpreted x-ray followed by the

21 contraband watch described by Plaintiff would clearly amount to adverse action. *See Brodheim v.*

22 *Cry*, 584 F.3d 1262, 1270 ('since harm that is more than minimal will almost always have a chilling

23 effect '[a]lleging harm and alleging the chilling effect would seem under the circumstances to be no

24 more than a nicety'). Defendants do not dispute that the contraband procedure entails that a prisoner

25 is: 1) dressed only in a t-shirt, boxer shorts, and shower shoes; 2) restrained in waist chains,

26

27

28

handcuffs, and leg irons; and 3) placed in a cell with no additional heat, running water, mattress or blanket, or cleaning supplies for three days.

If there are no valid security risks, the conditions of the contraband watch amount to adverse action as an unwarranted contraband watch 'would chill or silence a person of ordinary firmness from future First Amendment activities.' *See Brodheim v. Cry*, 584 F.3d 1262, 1271; *cf. Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988).

### ii.     Causation

In *Brodheim v. Cry*, the Ninth Circuit found that even when there was a dispute as to whether Plaintiff's 'disrespectful language' or the grievance as a whole was the motivating factor for adverse action, disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment. *Brodheim*, 584 F.3d at 1271. However, in this instance, Plaintiff alleges that he got into a "heated" argument with the Warden, Defendant Calderon regarding his grievance. As a result, Plaintiff received a rules violation, was placed in administrative segregation and may have been forced to undergo an unnecessary contraband search procedure.

Beyond Plaintiff's conclusory allegations, Plaintiff fails to direct the Court to any additional evidence (such as a signature on the grievance form) to demonstrate that any of the defendants knew about Plaintiff's grievance against officer Sutherland. However, Plaintiff's allegation that a "heated" argument occurred on December 11, 2002, between Plaintiff and Defendant Calderon is implied by Defendant Calderon's declaration, and is supported by the Rules Violation Report ("RVR") delivered by Defendant Howard. Doc. 146 (Plaintiff's Exhibit 40); Doc. 126-7 (Defendants' Ex. H, Gatling Decl., at ¶¶ 2-3, Ex. 24 at 132:9-14); Doc. 126-8 (Ex. 25 (RVR)). Additionally, the Rules violation Report and investigation lists Defendant Papac as the segregation authority and witness on the RVR and Defendant Winnet was the chief disciplinary officer involved with the RVR. From the

totality of the allegations and evidence provided, there is a genuine issue of material fact as to whether the adverse actions stemmed from Plaintiff disrespecting Defendant Calderon (Warden) by yelling and cursing at him on December 11, 2002, allegedly about his grievance, in a manner that could be heard throughout the unit.

The Rules Violation Report, accompanying investigation and the administrative findings together support that the "heated" argument between Plaintiff and Defendant Calderon was regarding his kosher food and 602 appeals. Doc. 126-8 (Defendants' Ex. H at Ex. 25 (RVR)).  The prison's internal investigation of the "heated" argument between Defendant Calderon and Plaintiff concluded that Plaintiff's "comments were directed to the Warden concerning kosher food and the 602 appeals." Doc. 126-8 (Defendants' Ex. H at Ex. 25 (RVR)).  Further, Plaintiff's witness for the RVR stated that the "Warden came to our cell door . . . talking about the letter that [Plaintiff] sent to him. . . . [Plaintiff] wanted to get the warden [sic] attention because he was being denied Due Process on several 602s . . . ."  126-8 (Defendants' Ex. H at Ex. 25 (RVR)).

Although disrespectful language within the context of a grievance is protected speech, the Ninth Circuit has yet to decide whether yelling and cursing at a Warden about a grievance is protected.  Other Circuits have found that yelling, cursing and otherwise undermining authority within the prison setting can pose serious security risks.  *See e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1297 (11th Cir. 2010) (describing a prison security rule that "prohibit[s] banging or yelling from inside a fully-secured cell because such a disturbance may incite or disturb other inmates or prevent security from hearing an inmate in need"); *Cygan v. Wisconsin Dept. of Corrections*, 388 F.3d 1092, 1101 (7th Cir. 2004) (prison guard's loud, profane and unprofessional speech in the presence of staff and inmates endangered both groups by exposing them to opportunistic acts of violence and undermining authority of supervising officer in presence of other officers and inmates and thus was

not protected); *Soto v. Dickie*, 744 F.2d 1260, 1267 (7th Cir. 1984) (open disrespect of authority "places the staff and other inmates in danger").   However, the prison's internal investigation of the "heated" argument between Defendant Calderon and Plaintiff concluded that the Reporting Employee's ("RE") report "fails to support the charge of inciting other inmates. The RE's report does not support the charge of violence even though [it] speaks to [Plaintiff] pounding on the cell door. This does show that [Plaintiff] was angry and acting inappropriately. There are no documented statements that Buckley threatens [sic] to . . . physically harm the Warden or incite the other inmates to commit violence. . . . [Additionally] Sgt. Rodriguez's report fails to support his statement that [Plaintiff's] actions incite other [sic] inmate. He does not provide evidence that [Plaintiff's] actions provoked other inmates into misconduct."  Defendants' Ex. H at Ex. 25 (RVR)).

Although a close call, the Court finds the above cited circuit courts persuasive in the conclusion that the appropriate channel to address legal claims is through the grievance procedure and the courts while yelling and open disrespect for authority outside the formal grievance process is unprotected speech.  *See e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1297; *Cygan v. Wisconsin Dept. of Corrections*, 388 F.3d 1092, 1101; *Soto v. Dickie*, 744 F.2d 1260, 1267.

Even assuming that the speech was protected or that the adverse action was a result of the actual grievance separate from the "heated" argument with Defendant Calderon, Plaintiff fails to sufficiently link Defendants Meadors and Johnson to the alleged retaliatory conduct.   The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution .
> . . shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983. The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In order to state a claim for relief under section 1983, Plaintiff must link each named defendant with some affirmative act or omission that demonstrates a violation of Plaintiff's federal rights.

Plaintiff fails to provide a sufficient response to Defendants' assertion that Defendant Meadors was transferred to a different unit days before the x-ray procedure was requested and that neither Defendants Johnson or Meadors were responsible for the decision to request a contraband x-ray. Doc. 126-1 at 28-29 (MSJ); Doc. 126-7 ( Ex. H-24 at 145:10-13; 148:17-149:1; 151:4-12; and 151:13-20 (Plaintiff's Deposition)). Moreover, since Defendant Vo's only participation was to order an x-ray based upon information given to him that there was suspected contraband, Plaintiff fails to link Dr. Vo to any retaliatory act.

Although Defendants argue that Defendants Winett, Papac and Howard's only involvement in Plaintiff's x-ray consisted of being present in the holding area (Doc. 126-1 at 28 (MSJ)), they were aware of the argument between Defendant Calderon (Warden) and Plaintiff. 126-8 (Ex. H at Ex. 25 (RVR)). There is sufficient inference of a causal link between Defendants Howard, Winett, Papac and Calderon to the adverse action given the fact that: 1) Defendant Howard delivered the RVR violation report regarding the "heated" argument between Plaintiff and Defendant Calderon; 2) Defendant Papac was listed as the segregation authority and witness on the RVR and following

administrative hearing; 3) Defendant Winnet was the chief disciplinary officer involved with the RVR and; 4) Defendant Calderon was involved in the heated argument allegedly regarding Plaintiff's grievance and according to Defendant Papac's testimony for the RVR investigation, Defendant Calderon ordered Plaintiff to be placed in administrative segregation. Doc. 126-8 (Ex. 25 (RVR, part C)).

This causal link is supported by the fact that Defendants Howard, Winnett, Papac and Calderon's declarations do not explicitly say they did not order or cause a contraband search procedure to be ordered and Defendants do not provide any documentary evidence (such as a formal x-ray request document) which would demonstrate that they did not order or cause to be ordered any contraband search. Additionally, although Defendants argue that Howard and Papac do not have the authority to order an x-ray, that does not entail that Defendants Howard and Papac did not provide statements to support the request for an x-ray. Moreover, if Defendant Kordan purposefully misread the x-ray, or no reasonable radiologist would have found an indication of contraband, its is possible to demonstrate a sufficient causal link for Dr. Kordan to the other defendants to retaliation. There remains a genuine issue of material fact as to whether Defendants Howard, Winnett, Papac, Calderon and Kordan took adverse action against Plaintiff in order to teach Plaintiff a lesson for disrespecting Defendant Calderon (Warden).

### iii.     Legitimate Penological Interest

Defendants argue that Plaintiff fails to demonstrate that the x-ray for determining the presence of contraband did not reasonably advance a legitimate correctional goal. Doc. 126-1 at 29 (MSJ). Defendants assert that Plaintiff's x-ray was a result of security concerns arising from an incident on December 6, 2002, where numerous inmates in his unit refused to return to their cells and there existed reasonable suspicion that some of the inmates (including Plaintiff) possessed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

contraband weapons.  Doc. 126-1 at 29 (MSJ).  However, Defendants do not direct the Court to any documentary evidence of the security incident which occurred on December 6, 2002, nor direct the Court to any evidence besides the declarations of Defendants Howard and Gaitling that there existed reasonable suspicion that Plaintiff possessed contraband weapons.  Doc. 126-9 (Ex. I, Howard Decl., at ¶ 8); 126-7 (Ex. H, Gatling Decl., at ¶ 2, Ex. 24 at 125:11-25).

Essential to this inquiry is what evidence is omitted: 1) the omissions in Defendant Vo's declaration; 2) the fact that Defendant Kordan did not submit a declaration; 3) and the omissions from Defendant's witness, Dr. Sepulveda.  Defendant Vo's declaration generally speaks of the contraband and x-ray procedure stating that: if custody staff suspect that an inmate has contraband in their abdominal cavity, they inform medical staff and request an authorization to conduct an x-ray.  Doc. 126-6 (Ex. C, Vo Decl.).  However, Defendant Vo's declaration fails to state which staff member submitted a request for the x-ray authorization.  In fact, if there were reasonable suspicion for the x-ray, it would seem logical that Defendants would present the x-ray request form which should detail the underlying evidence to substantiate that there was reasonable suspicion of contraband.

The key remaining question that Defendants fail to answer is whether the first x-ray interpretation by Dr. Kordan was an interpretation that another competent radiologist would have reached.  If no standard radiologist would have determined from the first x-ray that contraband existed, that would give an inference that Defendant Kordan purposefully misinterpreted the initial x-ray.  The Court will disregard Dr. Sepulveda's testimony since he has not demonstrated that he is qualified to give an opinion on the initial x-ray and the testimony he provided is not relevant to the issue of whether an average radiologist would have concluded the presence of contraband from the initial x-ray.  *See* Fed. R. Evid. 702 & 703.

Rule 702 of the Federal Rules of Evidence permits expert testimony if the expert is qualified, the expert's testimony provides "scientific, technical, or other specialized knowledge" to assist the trier of fact, and the expert's testimony is reliable.  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Dr. Sepulveda states that "although a General Practitioner Physician may initially review the x-ray for preliminary reading, a Medical Doctor specializing in Radiology completes the official report."  Doc. 126-6 (Ex. D, Sepulveda Decl., at ¶ 9).  Dr. Sepulveda does not say that he is a radiologist nor does he ever say that he reviewed the actual x-rays.  Doc. 126-6 (Ex. D, Sepulveda Decl.).  It appears that Dr. Sepulveda only summarizes Dr. Kordan's report of the x-ray.  Implied in Dr. Sepulveda's declaration is that Dr. Kordan specializes in radiology since he interpreted the x-ray and completed the report.  Based on Dr. Sepulveda's declaration, it does not appear that Dr. Sepulveda (not a radiologist) is qualified as an expert to evaluate the work of Dr. Kordan (a radiologist).  *See* Fed. R. Evid. 702 & 703.

Based on the above, the Court concludes that there remains a genuine issue of material fact as to whether there was a legitimate penological interest in ordering the x-ray in the first instance and there is a genuine issue of material fact as to whether the initial reading of the first x-ray was deliberately incorrect.  However, since the Court concludes that the adverse action was a result of Plaintiff yelling and cursing at the Warden (Defendant Calderon) and such speech is not Constitutionally protected, Plaintiff fails to state a retaliation claim.

///

1

2
### b.    Cruel and Unusual Punishment

3

4       "The Eighth Amendment's prohibition against cruel and unusual punishment protects

5  prisoners not only from inhumane methods of punishment but also from inhumane conditions of

6  confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Prison officials have

7  a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care,

8  and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S.

9  517, 526-27 (1984); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Johnson v. Lewis*, 217 F.3d

10 726, 731 (9th Cir. 2000); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982); *Wright v. Rushen*,

11 642 F.2d 1129, 1132-33 (9th Cir.1981); *Wolfish v. Levi*, 573 F.2d 118, 125 (2nd Cir.1978).  "[W]hile

12 conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the

13 wanton and unnecessary infliction of pain.'"  *Morgensen*, 465 F.3d at 1045 (quoting *Rhodes v.

14 *Chapman*, 452 U.S. 337, 347 (1981)).

15

16      Where a prisoner alleges an Eighth Amendment violation stemming from inhumane

17 conditions of confinement, prison officials may be held liable only if they acted with "deliberate

18 indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.

19 1998).  The deliberate indifference standard involves an objective and a subjective requirement.

20 First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ."  *Farmer v.

21 *Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, the

22 prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ."

23 *Farmer*, 511 U.S. at 837.

24

25      For the objective requirement, "[w]hat is necessary to show sufficient harm for purposes of

26 the Cruel and Unusual Punishment Clause depends upon the claim at issue . . . ."  *Hudson v.

27 *McMillian*, 503 U.S. 1, 8 (1992).  "[E]xtreme deprivations are required to make out a[n] [Eighth

28

Amendment] conditions-of-confinement claim." *Id.* at 9 (citation omitted).  With respect to this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quotations and citations omitted).  In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation.  The more basic the need, the shorter the time it can be withheld.  *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim.  *See Lewis*, 217 F.3d at 732-33.

"The Eighth Amendment guarantees adequate heating." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir.1996) (citing *Gillespie v. Civiletti*, 629 F.2d 642 (9th Cir.1980)).  "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis in original).  Further, "[t]he denial of adequate clothing can inflict pain under the Eight Amendment." *Walker v. Sumner*, 14 F.3d 1415, 1421 (9th Cir.1994) (citing *Hoptowit* 682 F.2d at 1246) abrogated in part on other grounds by *Sandin v. Connor*, 515 U.S. 472 (1995).

The Ninth Circuit has yet to directly address whether a contraband watch of this nature amounts to cruel and unusual punishment.  However, courts have explored contraband searches within the context of the Fourth and Eighth Amendments. *E.g.*, *Mendoza v. Blodgett*, 960 F.2d 1425, 1429-30 (9th Cir. 1992); *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988); *United*

*States v. Holloway*, 128 F.3d 1254, 1256 (8th Cir. 1997); *Sanchez v. Pererira-Castillo*, 590 F.3d 31, 37-48 (1st Cir. 2009); *Del Raine v. Williford*, 32 F.3d 1024, 1038-42 (7th Cir. 1994); *Chatman v. Tyner*, No. 1:03-CV-06636-AWI-SMS, 2009 WL 498958, at *3 (E.D. Cal. Feb. 26, 2009); *Frye v. Oleshea*, No. 4:08-CV-5288-CW, 2009 WL 1954500, at *3 (N.D. Cal. July 06, 2009); *Lira v. Cal. Dep't of Corrections*, No. 07-1447-SI, 2007 WL 2221019, at *3 (N.D. Cal. July 31, 2007) (concluding that Plaintiff had adequately pled an Eighth Amendment claim concerning his three-day detention on contraband watch in a filthy cell based upon false evidence); *Sital v. Burgio*, 592 F.Supp.2d 355, 359 (W.D.N.Y. 2009).

In *Tribble v. Gardner*, the Ninth Circuit noted in dicta that it may be possible for a contraband search to fall under the constitutional protections of the Eighth Amendment "[i]f the search were conducted for purposes unrelated to security considerations." *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988); *accord Del Raine v. Williford*, 32 F.3d 1024, 1029 (7th Cir. 1994) (citing *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6).   A contraband search in the absence of security reasons warrants an inference of an intent to punish.   *See Tribble v. Gardner*, 860 F.2d 321, 325 n.6 (9th Cir. 1988); *see also Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir.1987) ("The Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification.'").   In *Bell v. Wolfish*, the Supreme Court observed that a search conducted in an abusive fashion "cannot be condoned . . . . [and therefore,] . . . must be conducted in a reasonable manner." *Bell v. Wolfish*, 441 U.S. 520, 560 (1979).   In applying *Bell v. Wolfish*, the Seventh Circuit reasons:

> An Eighth Amendment application of this precept requires this court to focus on the words "abusive" and "reasonable." These words must be grafted onto the objective and subjective components of the Eighth Amendment. An application of reasonableness in this area often invokes a medical evaluation of the process. Abusiveness occurs when there is evidence of some palpable malevolence

1    attributable to a prison official exacerbated by the lack of a justifiable penological
2    objective for the search.

3    *Del Raine v. Williford*, 32 F.3d 1024, 1040.  It is unclear whether searches other than an abusive
4    digital rectal search would satisfy the objective component to demonstrate an Eighth Amendment
5    violation.  *See e.g.*, *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988) (observing that
6    a digital rectal cavity search without a security reason may constitute cruel and unusual punishment);
7    *Del Raine v. Williford*, 32 F.3d 1024, 1029 (recognizing that an unwarranted digital rectal search
8    may amount to cruel and unusual punishment); *Sital v. Burgio*, 592 F.Supp.2d 355, 359 (W.D.N.Y.
9    2009) (finding that a warranted contraband watch of six days, although unpleasant, did not constitute
10   cruel and unusual punishment).

11   It is clear that body cavity searches and exploratory surgery are some of the most severe
12   measures taken to discover contraband.  *See e.g.*, *Bull v. City and County of San Francisco*, 595 F.3d
13   964, 993 (9th Cir. 2010) (discussing the extreme intrusiveness and humiliation of body cavity
14   searches); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44-48 (1st Cir. 2009)(discussing that
15   exploratory surgery to discover contraband creates excessive pain and poses a serious risk to the life
16   and health of the prisoner).  In light of these extremes, x-rays and a "contraband watch" can be
17   viewed as less drastic alternatives for discovering contraband.  *E.g.*, *Sanchez v. Pereira-Castillo*, 590
18   F.3d 31, 44-48 (1st Cir. 2009) ("An x-ray-a much simpler, less invasive procedure-could have
19   confirmed [the contraband results].");  *Sital v. Burgio*, 592 F.Supp.2d 355, 359 (W.D.N.Y. 2009)
20   (finding that a contraband watch of six days was not particularly severe or jeopardize the health or
21   safety of the prisoner).

### i.   Defendants Reed, Mack, and Traynham

"A detention facility is a unique place fraught with serious security dangers. Smuggling of
money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441

U.S. 520, 559 (1979).  As the United Supreme Court observes, "attempts to introduce drugs and other contraband into [prison] premises . . . is one of the most perplexing problems of prisons." *Hudson v.Palmer*, 468 U.S. 517, 527 (1984); *see Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems."); *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984) ("We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country."); *Bull v. City and County of San Francisco*, 595 F.3d 964, 966-67 (9th Cir. 2010); *Del Raine v. Williford*, 32 F.3d 1024, 1039-42 ('The fact that prisoners are willing to place such dangerous objects into body cavities that most people rarely display to others demonstrates as much about the guile and bravado of certain prisoners as it does about the government's need to search, both visually and physically, such private areas of the body').

When an inmate is suspected of swallowing contraband, an x-ray and the above-described contraband procedure serves a legitimate penological interest given the inherent security risks and the great length that prisoners often undertake to conceal contraband.  A contraband watch which entails:1) restricting the inmate to only having a pair of boxer shorts, a t-shirt and shower shoes; 2) restraining the inmate in waist chains, handcuffs, and leg irons; 3) as well as placing the inmate in a cell with no running water, mattress, blanket, cleaning supplies serves the valid legitimate reason of ensuring security in the prison.  *See e.g.*, *Somers v. Thurman*, 109 F.3d 614, 622-23 (9th Cir. 1997) (body cavity search did not violate the Eighth Amendment of him, where Plaintiff did not allege that guards intended to humiliate him or that searches occurred without any penological justification); *Del Raine v. Williford*, 32 F.3d 1024, 1041-42 (a warranted digital rectal search was not unconstitutional under cruel and unusual punishment clause); *Sital v. Burgio*, 592 F.Supp.2d 355, 359; *cf. United States v. Holloway*, 128 F.3d 1254, 1256 (finding that given the valid security interests of the prison, the "dry cell" procedures were reasonable under the Fourth Amendment).

Moreover, when there is a valid security concern, an x-ray followed by the contraband watch is a milder method of discovering the presence of contraband when compared to a rectal cavity search, a method which has been upheld as constitutional. *Compare Somers v. Thurman*, 109 F.3d 614, 622-23 (9th Cir. 1997) *and Del Raine v. Williford*, 32 F.3d 1024, 1041-42 *with United States v. Holloway*, 128 F.3d 1254, 1256 *and Sital v. Burgio*, 592 F.Supp.2d 355, 359.

With regards to Plaintiff's specific allegations to being cold during the contraband watch in December, the Court finds that although uncomfortable, the cold condition is not objectively egregious to amount to cruel and unusual punishment given the valid penological interest in needing to observe an inmate and ensure inmate does not attempt to further conceal contraband. The court in *Chatman v. Tyner* addressed similar claims stemming from the same December 6, 2002, event at CCI. *Chatman v. Tyner*, No. 1:03-CV-06636-AWI-SMS, 2009 WL 498958, at *7 (E.D. Cal. Feb. 26, 2009). However, in *Chatman v. Tyner*, the Plaintiff was required to remain outdoors at 8:00 p.m. for "over thirty minutes, in inclement weather without sufficient clothing, before he was x-rayed." *Chatman v. Tyner*, No. 1:03-CV-06636-AWI-SMS, 2009 WL 498958, at *7. The court in *Chatman v. Tyner*, denied Defendants' summary judgment motion based on these facts given the severe outside evening temperature in December without adequate clothing. *Chatman v. Tyner*, No. 1:03-CV-06636-AWI-SMS, 2009 WL 498958, at *7. However, in this instance, Plaintiff was indoors, shielded from the elements and in a unit that was heated uniformly throughout the prison. Although Plaintiff was denied clothes and blankets and Plaintiff was undoubtedly uncomfortable, the Court finds that Plaintiff fails to meet his burden to demonstrate that given the valid penological interest of the contraband watch, that the deprivation is sufficiently serious to satisfy the objective prong to state an Eighth Amendment claim.

With regards to Plaintiff's allegations that he was placed in a cell covered with feces, Defendants submit their declarations that there was not any feces and Plaintiff reasserted his

allegations that he was placed in a cell covered with feces. Defendants did not file a reply. Enduring a feces covered cell for three days is grave enough to form the basis of a viable Eighth Amendment claim. *See McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) ("human waste has been considered particularly offensive so that 'courts have been especially cautious about condoning conditions that include an inmate's proximity to [it]' ") (citation omitted); *Fruit v. Norris*, 905 F.2d 1147, 1150–51 (8th Cir.1990) (common sense suggests that officials would know "that unprotected contact with human waste could cause disease"); *McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir.1991) (it is unquestionably a health hazard to have an inmate live in "filthy water contaminated with human waste").

To establish the existence or absence of feces in the cell from a previous inmate, it would be reasonable to expect that there would be documentary evidence in an activity log regarding the previous inmate to demonstrate that the previous inmate did not leave the cell covered in feces of if he did, what action was taken. *See Gaston v. Coughlin*, NO. 98-CV-6016F, 2005 WL 1177869 at *10-12 (W.D.N.Y., May 18, 2005) (Discussing documentary evidence at summary judgment regarding presence of feces in cell). As both Defendants and Plaintiff submit competing testimonial accounts, there still remains a genuine issue of material fact as to whether the cell was covered in feces and whether Defendants Reed, Mack, and Traynham knew that the cell was covered in feces.

### ii. Re-screening as Applied to Defendants Howard, Winnett, Papac, Calderon and Kordan

Where a detainee or prisoner seeks relief against "a governmental entity or officer or employee of a governmental entity," the Court is required to review the complaint and identify "cognizable claims." 28 U.S.C § 1915(a)-(b). Based upon review of Plaintiff's complaint and review of *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988), it is apparent that Plaintiff has raised a cognizable claim of first impression as to whether Defendants Howard,

1   Winnett, Papac, Calderon and Kordan violated the Eighth Amendment by maliciously implementing
2   an unnecessary contraband search.

3           Generally, an x-ray and contraband watch as described may not be unconstitutional given that
4   the procedures have a legitimate penological purpose.  However, as described in the above retaliation
5   analysis, Defendants have not demonstrated that the x-ray interpretation was not fraudulent and that
6   the contraband watch that Plaintiff underwent was warranted by a reasonable suspicion of a security
7   risk.  Based on the above retaliation analysis, the Court finds that Plaintiff has stated a cognizable
8   Eighth Amendment claim against Calderon, Papac, Howard and Kordan based on the allegation that
9   these Defendants were responsible for a deliberate false interpretation of the contraband x-ray and
10  setting in motion an unwarranted contraband search.  *See Tribble v. Gardner*, 860 F.2d 321, 324-25
11  & n.6 (9th Cir. 1988); *accord Del Raine v. Williford*, 32 F.3d 1024, 1029 (7th Cir. 1994) (citing
12  *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6).  Absent a legitimate security reason, the
13  contraband watch would have been a wanton and unnecessary means of punishment.

14          The Court finds that Plaintiff's original complaint would have given defendants adequate
15  notice of the facts that make up the Eighth Amendment claim against Defendants Calderon, Papac,
16  Howard and Kordan and that the discovery allowed regarding the retaliation claim would cover the
17  same facts necessary to decide the Eighth Amendment issue.  As the Court is cognizant that
18  Defendants need an opportunity to address this claim and in the interest of justice in recognizing the
19  original screening could have found an additional claim, the Court recommends that an Eighth
20  Amendment claim against Defendants Calderon, Papac, Howard and Kordan be added based on the
21  same factual allegations and that Defendants be required to re-brief this new claim in an
22  supplemental motion for summary judgment.

23  ///

24  ///

1

2

### E.      Claim 5: Equal Protection Claim Stemming From Missing Religious Property

#### 1.      Plaintiff's Allegations in Amended Complaint

Plaintiff alleges that on March 7, 2003, when he was at the property office prior to his transfer to California State Prison-Corcoran, Defendant Barker told Plaintiff he did not "give a shit about Jews." Doc. 42 (3rd Amend. Comp. at18:10-11).  Plaintiff alleges that defendant Chappel agreed with Barker and told Plaintiff that there is payback for inmates who disrespect the warden. Plaintiff alleges that on March 12, 2003, Defendants Barker and Chappel retaliated and discriminated against him, and denied him his right to practice his religion by confiscating his two menorahs, candles, and radio.  Plaintiff alleges that Defendant Barker assured Plaintiff that he and Defendant Chappel had packed all of Plaintiff's property, and called plaintiff a "smart ass Jew boy" as Barker was leaving the office.  *Id.* at 20:5.  On March 12, 2003, Plaintiff was subsequently transferred to California State Prison-Corcoran, where he discovered that his menorahs, candles, and radio were missing. Doc. 44; Doc. 146 at ¶ 45.  Upon screening the complaint, the Court concluded that it could proceed on an equal protection claim for discrimination on the basis of Plaintiff's religion.  Doc. 44 at 10.

#### 2.      Defendants' Motion for Summary Judgment

Defendants argue that in order to prevail in his equal protection claim, Plaintiff must demonstrate that Defendants intentionally discriminated on the basis of Plaintiff's religion by failing to provide him a reasonable opportunity to pursue his faith compared to other similarly situated religious groups. Doc. 126-1 at 39 (MSJ) (citing *Cruz v. Beto*, 405 U.S. 319, 321-22 (1972); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001)).  Although Plaintiff asserts that Defendants denied his Hanukkah candles and menorahs specifically because he was Jewish, Defendants assert that the candles and menorah were never listed as Plaintiff's personal property and posed a serious threat to safety and security of the institution due

41

to their flammable nature and ability to be made into a weapon.  Doc. 126-1 at 40 (MSJ).

Defendants assert that regardless of religion, Plaintiff's items would have been confiscated because

those items posed a threat to the safety and security of the institution.  Doc. 126-1 at 40 (MSJ).

### 3.   Plaintiff's Opposition

Plaintiff reasserts that his religious candles and menorah were confiscated in retaliation,

however, the Court has already screened out retaliation and allowed this claim to proceed on the

basis of equal protection.  Doc. 144 at 10; Doc. 44 at 10.  Plaintiff asserts that prior to his transfer

to Tehachapi prison where the allegations in his complaint occurred, he was incarcerated at High

Desert State Prison from 1997 to 2001.  Doc. 145 at ¶ 35.  While at Tehachapi, Plaintiff was

specifically permitted to have a menorah and candles. Doc. 145 at ¶ 35. Plaintiff cites to his general

chrono[3] which states:

> Inmate Buckley is and has been openly practicing the Jewish religion. He is
> authorized to possess and have as part of his allowable property items a Menorah Religious
> Candle Holder. The article is constructed of a light weight metal, brass in color, 8 ½ inches
> in length, 1 3/4 inches in width by 3 inches in height, capable of holding nine candles.
> Additionally, accompanying the Menorah is a small blue box containing sixteen (16) small
> candles, eight (8) yellow and eight (8) pink. These items will be entered on his property card
> and properly engraved with his prison number as a means of identity.

Doc. 146 at 238 (Exhibit 51).  Plaintiff further asserts that upon his arrival at CCI in 2001, his signed

property transfer receipt indicting "holder" among his listed property demonstrated that his menorah

was a part of his property.  Doc. 145 at ¶ 36; Doc. 146 at 240.  Plaintiff further submits his

declaration as proof that he had a menorah stating in his declaration that during the holiday of

Hanukkah of 2002, Plaintiff used his personal menorah in Facility Four Interfaith Chapel from

November 29, 2002, to December 6, 2002.  Doc. 145 at ¶ 42; Doc. 146 at 49.

---

[3] Plaintiff does not define the meaning of "chrono."  A "chrono" is documentation of an inmate's history
and what special permissions or accommodations are allowed to any particular inmate.  *See generally* Cal. Code
Regs. tit. 15, § 3000 (defining "general chrono" written on CDC Form 128-B "which is used to document
information about inmates and inmate behavior").

1

### 4.    Legal Standard and Analysis

2

"'To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of

3

the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose

4

to discriminate against the plaintiff based upon membership in a protected class.'" *Lee v. City of Los*

5

*Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th

6

Cir. 1998)).  "The Equal Protection Clause . . . is essentially a direction that all persons similarly

7

situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439

8

(1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  A prisoner is entitled "to 'a reasonable

9

opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere

10

to conventional religious precepts.'" *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (quoting

11

*Cruz v. Beto*, 405 U.S. 319, 321-22 (1972) (per curiam)).  To state a claim, a plaintiff must allege

12

facts sufficient to support the claim that prison officials intentionally discriminated against him on

13

the basis of his religion by failing to provide him a reasonable opportunity to pursue his faith

14

compared to other similarly situated religious groups. *Cruz*, 405 U.S. at 321-22; *Shakur*, 514 F.3d

15

at 891; *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250

16

F.3d 668, 686 (9th Cir. 2001); *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *overruled in*

17

*part on other grounds* by *Shakur*, 514 F.3d at 884-85.

18

Plaintiff alleged that Defendant Barker told Plaintiff he did not "give a shit about Jews" and

19

that Defendant Chappel agreed with Barker and told Plaintiff that there is payback for inmates who

20

disrespect the warden.  Plaintiff further alleges that Defendants Barker and Chappel confiscated his

21

two menorahs, candles, and radio.  Defendants assert that the candles and menorah were never listed

22

as Plaintiff's personal property and pose a serious threat to safety and security of the institution due

23

to their flammable nature and ability to be made into a weapon.  Plaintiff has provided evidence that

24

he had a Chrono allowing him to have the menorah and candles to refute Defendants' assertion that

25

26

27

28

43

1
2   the menorah and candles posed a security risk.   Moreover, Plaintiff has provided evidence to
3   demonstrate that the menorah was listed as a part of his property when he transferred prisons.
4   Plaintiff did not put forward any argument or direct the court to any evidence regarding his radio.
5   Defendants have not come forward with any reply or argument to challenge Plaintiff's evidence that
6   he had the menorah and candles as well as address whether possessing the menorah and candles truly
7   posed a security threat.
8
9          Based on the foregoing, the Court finds that there is a genuine issue of material fact as to
10  whether Plaintiff had the menorah and candles in the first place, whether the menorah and candles
11  create a security risk, and whether Defendants Chappel and Barker confiscated Plaintiff's menorah
12  and candles with the intent to discriminate against Plaintiff on the basis of his religion.
13
14
15  **III.    Conclusion and Recommendation**
16         Summary judgment is appropriate against a party who "fails to make a showing sufficient to
17  establish the existence of an element essential to that party's case, and on which that party will bear
18  the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Plaintiff has the burden of showing that
19  Defendants violated his rights. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Thomas v. Ponder*,
20  611 F.3d 1144, 1150-51 (9th Cir. 2010).
21         As discussed above, Plaintiff failed to make such a showing on the following claims: 1)
22  retaliation claim against Defendants Howard, Johnson, Barker, Chappel, Papac, Meadors, and Winett
23  based on a theory of retaliatory repeated routine pat-down searches; 2) RLUIPA and Free Exercise
24  claims against Defendants Winett, Meadors, Barker, and Woodley regarding the confiscation of
25  Plaintiff's kosher food Package; 3) retaliation claim against Defendants Calderon, Winett, Meadors,
26  Papac, Howard, Johnson, Vo, and Kordan regarding the x-ray and contraband watch; and 4) Eighth
27
28

Amendment claim against Defendants Reed, Mack, and Traynham for implementing the contraband watch procedure. Plaintiff has met his burden to demonstrate there exist a genuine issue of material fact regarding: 1) Equal Protection claim against Defendants Chappel and Barker for the confiscated menorah and candles; and 2) Eighth Amendment claim against Defendants Reed, Mack, and Traynham for deliberately placing Plaintiff in a cell covered with feces.

The Court sua sponte re-screened Plaintiff's complaint and found that Plaintiff has stated a cognizable Eighth Amendment claim against Defendants Howard, Winnett, Papac, Calderon and Kordan based on involvement with maliciously implementing a contraband search without valid penological interest.

For the reasons set forth herein, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment filed on September 13, 2010, be GRANTED IN PART and DENIED IN PART (Doc. 126) as follows:

     a.      granted as to Plaintiff's retaliation claim against Defendants Howard, Johnson, Barker, Chappel, Papac, Meadors, and Winett based on a theory of retaliatory repeated routine pat-down searches;

     b.      granted as to Plaintiff's RLUIPA and Free Exercise claims against Defendants Winett, Meadors, Barker, and Woodley regarding the confiscation of Plaintiff's kosher food Package;

     c.      granted as to Plaintiff's retaliation claim against Defendants Calderon, Winett, Meadors, Papac, Howard, Johnson, Vo, and Kordan regarding the x-ray and contraband watch;

     d.      granted as to Plaintiff's Eighth Amendment claim against Defendants Reed, Mack, and Traynham for implementing the contraband watch procedure;

e.      denied as to Plaintiff's Eighth Amendment claim against Defendants Reed, Mack, and Traynham for placing Plaintiff in a cell that was covered in feces;

f.      denied as to Plaintiff's Equal Protection claim against Defendants Chappel and Barker for the confiscated menorah and candles;

2.      As the Court re-screened Plaintiff's complaint and found that Plaintiff has stated a cognizable Eighth Amendment claim against Defendants Howard, Winnett, Papac, Calderon and Kordan based upon involvement with maliciously implementing a contraband search without a valid penological interest; the Court recommends that Defendants submit a supplemental motion for summary judgment on the issue of whether Defendants Howard, Winnett, Papac, Calderon and Kordan violated the Eighth amendment by maliciously implementing a contraband search without a valid penological interest.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

Dated:    December 20, 2011

UNITED STATES MAGISTRATE JUDGE