1

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8                          EASTERN DISTRICT OF CALIFORNIA

9    ANTONIO C. BUCKLEY,                    CASE NO. 1:04-cv-05688-LJO-GBC PC

10                        Plaintiff,        FINDINGS  AND  RECOMMENDATIONS
                                            R E C O M M E N D I N G   G R A N T I N G
11        v.                                DEFENDANTS' SUPPLEMENTAL MOTION
                                            FOR SUMMARY JUDGMENT
12   ALAMEIDA, et al.,
                                            (Doc. 162)
13                        Defendants.
                                            OBJECTIONS DUE WITHIN FOURTEEN DAYS
14
                                    /
15

16                       **FINDINGS and RECOMMENDATIONS**

17   **I.       Procedural History**

18        Plaintiff Antonio Cortez Buckley ("Plaintiff") is a state prisoner proceeding pro se in this

19   civil rights action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-1 (the Religious Land Use

20   and Institutionalized Persons Act ("RLUIPA")).  At the times relevant to this complaint, Plaintiff

21   was incarcerated at California Correctional Institution (CCI), in Tehachapi, California.  Doc.  126-2

22   at 12 (Def.'s Undisputed Facts). On September 29, 2003, Plaintiff filed the original complaint.  Doc.

23   1.  On March 23, 2007, Plaintiff filed the third amended complaint which the Court found to have

24   stated cognizable claims against the following defendants: Calderon; Vo; Meadors; Reed; Kordan;

25   Traynham; Papac; Winett; Woodley; Barker; Howard; Johnson; Mack; and Chappel ("Defendants").

26   Doc. 42; Doc. 44.

27        The Court issued the first discovery and scheduling order on September 19, 2007, which

28   stated that the unenumerated 12(b) motion deadline was November 26, 2007, and the deadline for

                                             1

filing dispositive motions was August 7, 2008.  Doc. 65.  After Defendants failed to submit any motions and the August 7, 2008, deadline has passed, the Court filed the second scheduling order setting trial dates. Doc. 77.  On August 21, 2008, Defendants motioned to vacate the discovery and scheduling order and requested for the Court to reset the deadlines for dispositive motions.  Doc. 80. On September 24, 2008, the Court vacated the previous scheduling order and reset the dispositive motion deadline for  June 1, 2009.  Doc. 84.

On May 27, 2010, Defendants filed a motion for a seventy-four day extension to file dispositive motions and the Court granted the extension, setting the new deadline to August 9, 2010. Doc. 120; Doc. 121.  On August 9, 2010, Defendants motioned for a thirty day extension to file dispositive motions which the Court granted, setting the new deadline for September 14, 2010.  Doc. 122; Doc. 123.  On September 13, 2010, Defendants filed a motion for summary judgment.  Doc. 126.

On December 20, 2011, the Court issued findings and recommendations which recommended granting in part Defendants' motion for summary judgement and recommended that Defendants be allowed to file a supplemental motion for summary judgement on the issue of whether Defendants Howard, Winnett, Papac, Calderon and Kordan violated the Eighth Amendment by maliciously implementing an unnecessary contraband search. Doc. 151.  On January 25, 2012, the District Court Judge adopted the findings and recommendations in full and dismissed Plaintiff's retaliation claims against Defendants Howard, Johnson, Barker, Chappel, Papac, Meadors, and Winnett for subjecting Plaintiff to repeated, routine pat-down searches; dismissed Plaintiff's Free Exercise and RLIUPA claims against Defendants Winett, Meadors, Barker, and Woodley; dismissed Plaintiffs retaliation claims against Defendants Calderon, Winett, Meadors, Papac, Howard, Johnson, Vo, and Kordan for subjecting Plaintiff to an x-ray and placing him on contraband watch; dismissed Plaintiff's Eighth Amendment claims against Defendants Reed, Mack, and Traynham for implementing the contraband watch procedures.  Doc. 153.

The Court denied, in part, Defendants' motion for summary judgment and the following claims and defendants are to proceed to trial: Defendants Reed, Mack and Traynham for allegedly placing Plaintiff in a cell that was covered in feces; Defendants Chappel and Barker for violation of

Plaintiff's First Amendment rights by allegedly confiscating Plaintiff's menorah and candles.  Doc.
153.   In its order to adopt, the District Court Judge required Defendants to either submit a
supplemental motion for summary judgment on the issue of whether Defendants Howard, Winnett,
Papac, Calderon and Kordan[1] violated the Eighth amendment by maliciously implementing a
contraband search without a valid penological interest or to file notice of their desire to go to trial
on the issue.  Doc. 153.  On March 30, 2012, and May 14, 2012, the Court granted Defendants'
motions for an extension of time to file a supplemental motion for summary judgement.  Doc. 157;
Doc. 166.  On May 10, 2012, Defendants filed the supplemental motion for summary judgment.
Doc. 162; Doc. 163.  On May 29, 2012, and July 3, 2012, the Court granted Plaintiff's motions for
extension of time to file an opposition.  Doc. 168; Doc. 170.  On August 3, 2012, Plaintiff filed an
opposition and supporting materials.  Doc. 172; Doc. 173; Doc. 174.  Defendants did not file a reply.

## II.   Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue
as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c).  Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the
burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made
in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"
*Id*.  Summary judgment should be entered, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.* at 322.
"[A] complete failure of proof concerning an essential element of the nonmoving party's case

---

[1] On March 28, 2012, in a motion for extension of time, Defendants stated that Defendant Kordan has died.
Doc. 156.  On August 24 2012, the Court ordered Defendants to submit a formal suggestion of the death of
Defendant Kordan pursuant to Fed. R. Civ. P. 25(a)(1).  Doc. 178.

necessarily renders all other facts immaterial." *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and by specifically referencing any other portions of the record they wish the Court to consider.  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not mine the record for triable issues of fact.  *Id.*

## III.   Eighth Amendment Claim Resulting from the X-ray and Contraband Watch

### A.   Factual Background

Plaintiff Antonio Buckley is a state prisoner who was incarcerated at California Correctional Institution (CCI), located in Tehachapi, California.  Plaintiff was housed in Facility III, Unit 4.  Doc. 162-2 at 12.  At times relevant to this action, Defendants were employed by the California Department of Corrections and Rehabilitation (CDCR), and held the following positions at CCI: Defendant Calderon was the Warden; Defendant Winett was an Associate Warden; Defendant Papac

was a Correctional Lieutenant; Defendant Howard was a Correctional Sergeant; and Defendant Kordan was a Medical Doctor. Doc. 162 at 4. On December 6, 2002, at approximately 6:45 p.m., staff in the Level IV Facility were conducting a controlled feeding. 163-1 at 2-3 (Def. Ex. A (Incident Report). Following the evening meal, as the inmates entered the building, roughly 160 inmates refused to return to their cells. 163-1 at 2-3 (Def. Ex. A (Incident Report). The inmates refused to comply with orders to return to their cell, so Sergeant Phillips instructed the control booth officer to put the dayroom down. 163-1 at 3 (Def. Ex. A (Incident Report). The inmates in the dayroom complied, and they were systematically locked back into their cells by section. 163-1 at 3 (Def. Ex. A (Incident Report).

Although most of the inmates returned to their cells, approximately fifty-five to sixty Black inmates gathered together in C-Section, and grabbed mop handles and broomsticks. 163-1 at 3 (Def. Ex. A (Incident Report). The approximately sixty Black inmates then gathered together on the upper tier of C-Section, armed with the wooden weapons. 163-1 at 3 (Def. Ex. A (Incident Report). Because staff were outnumbered, staff were ordered to exit the building. Doc. 163-1 at 24 (Def. Ex. B (Declaration of J. Lundy at ¶ 8). Lieutenant Dunlop then went to the control booth and spoke with several of the Black inmates in an attempt to get them to return to their cells. 163-1 at 3 (Def. Ex. A (Incident Report). Lieutenant Dunlop agreed to meet with three of the leaders of the group of Black inmates, on the condition that the remaining Black inmates return to their cells. 163-1 at 3 (Def. Ex. A (Incident Report). The remainder of the Black inmates returned to their cells without further incident. 163-1 at 3 (Def. Ex. A (Incident Report).

Following the incident, the facility was placed on lockdown, and a state of emergency was declared. Doc. 163-1 at 24 (Def. Ex. B (Declaration of J. Lundy at ¶ 10). Several inmates involved in the incident were placed in administrative segregation. Doc. 163-1 at 25 (Def. Ex. B (Declaration

of J. Lundy at ¶ 14)).   An investigation was conducted into the cause of the incident, and staff learned that there was a planned assault on staff, and that the inmates intended to continue with their plans once the lockdown was lifted.   Doc. 163-1 (Def. Ex. C (Confidential Memorandum dated December 10, 2002, filed under seal)).   Staff also found that several of the broomsticks and mop handles were missing.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 15)).   Because these items were made of wood, they could not be discovered by using a metal detector.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 16)).

It is not uncommon for inmates to try to smuggle contraband such as weapons or notes into administrative segregation, by staging an incident.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 17)).   According to a declaration provided by Defendants, all inmates placed into administrative segregation following the events of December 6, 2002, were given the option of submitting to an x-ray, or being placed on contraband watch.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶¶ 15-17)); Doc. 163-1 at 29-30 (Def. Ex. D (Contraband Watch Procedures)).   If the x-ray was either positive for contraband, or was inconclusive, the inmate was placed on contraband watch.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 19)).

On December 11, 2002, Plaintiff and Defendant Calderon (Warden at CCI) got into an argument concerning his grievance over the confiscation of his kosher food package.   Doc. 146 (Plaintiff's Exhibit 40); Doc. 126-7 (Defendants' Ex. H, Gatling Decl., at ¶ 2, Ex. 24 at 132:9-14; Doc. 126-8 (Ex. 25 (RVR)).   Plaintiff was issued a disciplinary violation, and notified that he was being placed into administrative segregation for engaging in conduct that could lead to violence, and for disrespect.   Doc. 163-2 at 28-36 (Ex. E (RVR).   Plaintiff was given the option of submitting to an x-ray.   Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 17)).   The x-ray was taken, and Defendant Kordan found that the x-ray showed "abnormal, noncalcified, foreign material . . . in the

rectal ampulla." Doc. 163-2 at 42 (Def. Ex. F (Medical Report). Plaintiff was placed on contraband watch where he remained until December 13, 2002. Doc. 42 at 17-18; Doc. 44 at 8.

As a part of contraband watch procedure, Plaintiff: 1) was forced to remove his pants, shirt, and shoes, and; 2) was placed in full mechanical restraints, a waist chain, handcuffs, and leg irons. Doc. 42 at 16; Doc. 44 at 8; Doc. 163-1 at 29-30 (Def. Ex. D (Contraband Watch Procedures)). Plaintiff was dressed only in a t-shirt, boxer shorts, and shower shoes, and was placed in a holding cell the size of a telephone booth and made of metal mesh. Doc. 42 at 16; Doc. 44 at 8; Doc. 163-1 at 29-30 (Def. Ex. D (Contraband Watch Procedures)).

**B.     Defendants' Supplemental Motion for Summary Judgment**

**1.     Defendant Kordan's Misreading of X-Ray**

Defendants argue that Plaintiff has failed to allege facts to show that Defendant Kordan engaged in a conspiracy to purposefully misread an x-ray and thus fails to establish an Eighth Amendment violation. Doc. 162 at 7. Defendants assert that the essence of Plaintiff's claims against Dr. Kordan is that he misread the x-ray films and, as a result, Plaintiff was placed on contraband watch for two days. Doc. 162 at 8. Defendants argue that even accepting that Defendant Kordan misread the films, such an allegation would, at best, indicate a claim for medical malpractice. Doc. 162 at 8. Defendants state that Defendant Kordan is also the radiologist who determined two days later, that Plaintiff showed no sign or possessing gastrointestinal contraband. Doc. 163-2 at 42 (Defendants' Exhibit (Def. Ex. F)). Further, Defendants state that Dr. Vo had previously explained that an x-ray could show a foreign body even when no such body was present. Doc. 126-6 (Def. Ex. C (Vo. Decl.)). Defendants argue that since Plaintiff has not provided any competent expert evidence to dispute the Dr. Vo's opinion, and Plaintiff is not himself qualified to dispute Dr. Vo's medical opinions, Plaintiff's Eighth Amendment claim against Defendant Kordan should be

dismissed.  Doc. 162 at 8.

### 2.   Conspiracy

In response to Plaintiff claims that all Defendants' actions were part of a concerted effort to place him on contraband watch, Defendants argue that Plaintiff fails to produce any evidence of an agreement between them to violate his constitutional rights.  Doc. 162 at 9.  Defendants argue that Plaintiff's conclusion that a conspiracy is evident because of the x-ray results and subsequent contraband watch is insufficient to withstand a motion for summary judgment.  Doc. 162 at 9.

### 3.   Penological Interest

Defendants argue that the undisputed facts demonstrate that wooden weapons stock was missing, and could not be detected with the use of a metal detector.  Doc. 162 at 9; Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 15)).  According to Defendants, in order to prevent inmates from smuggling contraband, such as wooden weapons stock, into administrative segregation, any inmate who was sent to administrative segregation following the incident of December 6, 2002, was required to submit to an x-ray, or be placed on contraband watch, for the valid penological reason of preventing inmates from the smuggling contraband into administrative segregation.  Doc. 162 at 9; Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶¶ 15-17)).

### 4.   Contraband Watch - Objectively Serious

Defendants argue that Plaintiff's placement on contraband watch for two days was not long enough to rise to the level of an Eighth Amendment violation; he was released and sent to administrative segregation as soon as officials were satisfied that he had not hidden contraband in his body.  Doc. 162 at 11 (citing *Meraz v. Reppond*, 2009 WL 723841, *2 (N.D. Cal)).  Defendants argue that, the contraband watch is not the type of deprivation that is sufficiently serious to implicate the Eighth Amendment.  Doc. 162 at 11.  Defendants argue that Plaintiff's allegations that he was

placed on contraband watch for two days, in a cell that had feces on the floor because unnamed officers tossed fecal matter into the cell fail to connect any of the Defendants to intentionally placing Plaintiff in a feces-covered cell.  Doc. 162 at 12.

### 5.    Implementation of Contraband Watch - Subjective Mind Set

Defendants state that Plaintiff also appears to allege that his placement on contraband watch was due to his religious beliefs. Doc. 162 at 12.  Defendants argue that the undisputed facts establish that all inmates who were placed into administrative segregation following the events of December 6, 2002, were required to either undergo an x-ray, or be placed on contraband watch.  Doc. 162 at 12; Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶¶ 15-17)).  According to Defendants, any inmate who had either a positive or inconclusive x-ray result was placed on contraband watch for the sole purpose of preventing contraband from being smuggled into administrative segregation. Doc. 162 at 12;  (citing Doc. 163-1 at 25) (Def. Ex. B (Declaration of J. Lundy at ¶ 19).  Defendants argue that Plaintiff presents no evidence to create a dispute of fact that Defendants were motivated by religious animus, or any other unlawful purpose.  Doc. 162 at 12.  Thus, even assuming that Plaintiff could establish that he suffered a sufficiently serious deprivation as a result of his placement on contraband watch, there is no evidence to support an argument that Defendants knew of and disregarded any excessive risk to Plaintiff's health or safety as a result of the contraband watch. Doc. 162 at 12.  Because the x-ray suggested that Plaintiff may have sought to conceal contraband by "keistering" it, he was placed on contraband watch until he was cleared.  Doc. 162 at 12. Defendants argue that their actions were based on the valid penological interest of maintaining institutional security and, accordingly, Plaintiff's Eighth Amendment rights were not violated.  Doc. 162 at 12.

### 6.    Qualified Immunity

Defendants argue Plaintiff cannot show either that any of the Defendants violated his constitutional rights or, if they did violate such a right, that their conduct was unreasonable. Doc. 162 at 13. Defendants argue that Plaintiff cannot establish that any of the Defendants subjected Plaintiff to an x-ray and contraband watch for any reason other than the valid penological interest of maintaining institutional security. Doc. 162 at 13. Defendants argue that even if a constitutional violation had occurred, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed that placing Plaintiff on contraband-watch for two days, when wooden weapons stock was missing and Plaintiff's x-ray revealed foreign matter in the rectal ampulla, was lawful. Doc. 162 at 14.

**C.     Plaintiff's Opposition**

In his opposition Plaintiff reiterates much of the allegations he had made in his complaint. Doc. 172. Plaintiff asserts that he was on contraband watch for three days where he was only allowed a T-shirt, a pair of boxers and shower shoes while in a freezing cell. Doc. 172 at 6. According to Plaintiff, he suffered pain from being placed in handcuffs with a "Chinese Black Box" device that goes between the handcuffs and is attached to waist-chains in addition to ankle restraints to restrict movement. Doc. 172 at 6. Plaintiff asserts that he was placed in a freezing cell covered in feces. Doc. 172 at 6. Plaintiff asserts that Defendant Kordan intentionally falsified the December 11, 2002, x-ray report as part of a conspiracy to place Plaintiff on contraband watch. Doc. 172 at 7. Plaintiff argues that in order to sustain a conspiracy claim, no formal agreement between the parties in necessary, rather, it is sufficient that the minds of the parties met so as to bring about an intelligent and deliberate agreement to do the act although such an agreement is not manifested by any formal words. Doc. 172 at 9 (citing *Telman v. United States*, 67 T.2d 716 (10th Cir.); *Lawlor v. Loewe*, 209 F. 721, 725 (2d Cir.)). Plaintiff argues that the conspiracy can be established through inference from

10

the actions of the Defendants when Plaintiff was placed on contraband watch contrary to the established policy. Doc. 172 at 9-10 (citing *Goode v. United States*, 58 F.2d 205 (8th Cir.); Doc. 174 at 71 (Pltf's Ex. 13 at 1 (Contraband Watch Procedure)). The contraband watch procedure for the Quarantine Watch Officer states, in part, that: "When it becomes reasonable to suspect an inmate is in possession of contraband, either ingested or secreted within any body orifice, a contraband watch may be ordered." Doc. 174 at 71 (Pltf's Ex. 13 at 1). Plaintiff argues that Defendant Calderon, Winett, Papac and Howard forced Plaintiff to take an x-ray for no penological reason. Doc. 172 at 10. Plaintiff argues that it is relevant that although the x-ray interpretation concluded that there was rectal contraband, after three days of contraband watch without having a bowel movement and was x-rays on December 13, 2002, were interpreted as not showing evidence of contraband. Doc. 172 at 11.

Plaintiff states that on December 11, 2002, after Plaintiff got into a heated argument with the warden, Defendant Calderon ordered Defendant Papac to place Plaintiff in Administrative Segregation. Doc. 172 at (citing Doc. 174 at 177 (Pltf. Ex. 23 at 5)). Plaintiff argues that Defendants have not produced any documentary evidence that any other prisoner was given an x-ray from December 6, 2002, to December 11, 2002. Doc. 172 at 13. Plaintiff argues that Defendants arbitrarily circumvented the established contraband watch policies and that Defendant Calderon implemented a rogue contraband watch policy for the purpose of singling out Plaintiff for a contraband watch without suspicion of having contraband. Doc. 172 at 13, 16. Plaintiff states that Defendants forced Plaintiff to take the x-ray. Doc. 172 at 14.

Plaintiff argues that Defendants have piled conjectures to justify their policies. Doc. 172 at 14-15. Plaintiff argues that: 1) although Defendants state that the x-ray/contraband search was justified due to the incident in December 6, 2002, involving approximately 60 black inmates

obtaining broom and mop handles for weapons, Plaintiff was not housed in the unit where this incident took place; 2) although Defendants state that wood and metal was missing from the December 6, 2002 incident, Defendants have not produced any official report regarding the missing wood and metal; and 3) Defendants' argument that Plaintiff staged an argument with the Warden in order to smuggle contraband into Administrative Segregation is speculative.  Doc. 172 at 15. Plaintiff also argues that Defendants purposefully destroyed all of the contraband records and it is evidenced by their responses to discovery and declaration from the litigation coordinator which state that they were unable to locate the daily log book, inmate segregation records and tape-recorded interviews for December 2002.  Doc. 172 at 19 (citing to Doc. 174 at 96-97, 135).  Plaintiff argues that a conspiracy to cover-up the contraband watch is evident from the fact that Plaintiff's Administrative Segregation medical report omitted Plaintiff's contraband watch.  Doc. 174 at 170 (citing Pltf's Ex. 14 at 7; Pltf's Ex. 28).

Plaintiff also points out that although Defendants obfuscate the issue by stating he was not arbitrarily placed on contraband watch as a result of his religion, Plaintiff argues that the arbitrary contraband watch had nothing to do with his religious beliefs.  Doc. 172 at 20.  Plaintiff also argues that Defendants have not produced any official reports to demonstrate that other prisoners transferred to Administrative Segregation after December 6, 2002, had taken an x-ray pursuant to Defendant Calderon's new contraband policy and not just Plaintiff.  Doc. 172 at 20 (citing Doc. 174 at 163-164, 170) (Plaintiff's Declaration); Doc. 172 at 21.  Plaintiff argues that Defendants Calderon, Winnet, Papac and Howard committed perjury when they responded to interrogatories that they had no personal knowledge as to why Plaintiff was given an x-ray on December 11, 2002.  Doc. 174 at 168-169.

Finally, Plaintiff argues that if an Eighth Amendment violation is found, there is defense of

qualified immunity is not available.  Doc. 172 at 22.

### D.  Legal Standard and Analysis: Eighth Amendment

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982); *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir.1981); *Wolfish v. Levi*, 573 F.2d 118, 125 (2nd Cir.1978).  "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" *Morgensen*, 465 F.3d at 1045 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Where a prisoner alleges an Eighth Amendment violation stemming from inhumane conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard involves an objective and a subjective requirement.  First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837.

For the objective requirement, "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue . . . ." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  "[E]xtreme deprivations are required to make out a[n] [Eighth

Amendment] conditions-of-confinement claim." *Id.* at 9 (citation omitted). With respect to this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quotations and citations omitted). In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it can be withheld. *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

In *Tribble v. Gardner*, the Ninth Circuit noted in dicta that it may be possible for a contraband search to fall under the constitutional protections of the Eighth Amendment "[i]f the search were conducted for purposes unrelated to security considerations." *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6 (9th Cir. 1988); *accord Del Raine v. Williford*, 32 F.3d 1024, 1029 (7th Cir. 1994) (citing *Tribble v. Gardner*, 860 F.2d 321, 324-25 & n.6). A contraband search in the absence of security reasons warrants an inference of an intent to punish. *See Tribble v. Gardner*, 860 F.2d 321, 325 n.6 (9th Cir. 1988); *see also Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987) ("The Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification.'"). In *Bell v. Wolfish*, the Supreme Court observed that a search conducted in an abusive fashion "cannot be condoned . . . . [and therefore,] . . . must be conducted in a reasonable manner." *Bell v. Wolfish*, 441 U.S. 520, 560 (1979). In applying *Bell v. Wolfish*, the Seventh Circuit reasons:

> An Eighth Amendment application of this precept requires this court to focus on the words "abusive" and "reasonable." These words must be grafted onto the objective and subjective components of the Eighth Amendment. An application of reasonableness in this area often invokes a medical evaluation of the process. Abusiveness occurs when there is evidence of some palpable malevolence attributable to a prison official exacerbated by the lack of a justifiable penological

14

objective for the search.

*Del Raine v. Williford*, 32 F.3d 1024, 1040.   "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v.Wolfish*, 441 U.S. 520, 559 (1979).  As the United Supreme Court observes, "attempts to introduce drugs and other contraband into [prison] premises . . . is one of the most perplexing problems of prisons." *Hudson v.Palmer*, 468 U.S. 517, 527 (1984); *see Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems."); *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984) ("We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country."); *Bull v. City and County of San Francisco*, 595 F.3d 964, 966-67 (9th Cir. 2010); *Del Raine v. Williford*, 32 F.3d 1024, 1039-42 ('The fact that prisoners are willing to place such dangerous objects into body cavities that most people rarely display to others demonstrates as much about the guile and bravado of certain prisoners as it does about the government's need to search, both visually and physically, such private areas of the body').  A prison policy to routinely conduct contraband searches without individualized reasonable suspicion due to heightened security concerns is sufficient to demonstrate the existence of a valid penological interest.  *Cf. Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 975-981 (9th Cir. 2010) (en banc).

### 1.    Analysis

The remaining issue was whether the contraband search was done without a valid penological interest but rather as a means to punish Plaintiff for disrespecting the warden of the prison. Defendants submit a declaration from J. Lundy who was a correctional Lieutenant during December 2002, who detailed the details surrounding approximately sixty inmates armed with wooden weapons and refusing to return to their cells which led to prison staff being ordered to exit the building for their own protection.  163-1 at 3 (Def. Ex. A (Incident Report); Doc. 163-1 at 24 (Def. Ex. B

15

(Declaration of J. Lundy at ¶ 8). Officer Lundy stated that due to the severe threats to security the facility was placed on lockdown, and a state of emergency was declared. Doc. 163-1 at 24 (Def. Ex. B (Declaration of J. Lundy at ¶ 10). Defendants presented evidence that several inmates involved in the serious security violations were placed in administrative segregation and that a policy was in place that all inmates who were sent to administrative segregation had to chose between getting an x-ray or undergoing a contraband watch. Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 14-17)). If the x-ray was either positive for contraband, or was inconclusive, the inmate was placed on contraband watch. Doc. 163-1 at 25 (Def. Ex. B (Declaration of J. Lundy at ¶ 19)).

Defendants had met their initial burden to demonstrate that there exists valid penological interests to have a policy in place where all inmates entering administrative segregation had to either have an x-ray or undergo a contraband watch. *Cf. Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 975-981 (9th Cir. 2010) (en banc). However, in Plaintiff's opposition and declaration Plaintiff asserts that: 1) the policy to do contraband searches on all inmates entering administrative segregation was a "rogue" policy; 2) there is no evidence that any other inmate going into administrative segregation following the December 6 incident had to undergo this contraband procedure; 3) Plaintiff was housed in Plaintiff was housed in Facility III when the December 6 incident happened in Facility IV; and 4) if there was such a policy in place, that contradicts Defendants' interrogatory responses that they did not know why Plaintiff had to undergo a contraband search. Doc. 172 at 20 (citing Doc. 174 at 163-64, 168-70) (Plaintiff's Declaration); Doc. 172 at 21. Given that Defendants have not submitted any reply, Plaintiff has sufficiently met his burden that there remains a disputed issue of material fact as to whether there existed a policy to require all inmates entering administrative segregation to undergo a contraband search.

However, Plaintiff has not submitted any admissible medical or other competent evidence that shows there is a triable issue that not only was the x-ray interpretation incorrect, but that the x-

ray interpretation was so grossly misinterpreted that it would warrant an inference that Defendant Kordan was a part of a conspiracy with Defendants Howard, Winnett, Papac and Calderon to intentionally misread the x-rays in order for Plaintiff to undergo an unnecessary contraband watch. Furthermore, Plaintiff fails to offer evidence to establish that he is qualified to interpret medical records. Fed. R. Evid. 702. Even if Plaintiff could connect Defendants Howard, Winnett, Papac and Calderon to requiring Plaintiff to undergo an x-ray, Plaintiff fails to connect Defendants Howard, Winnett, Papac and Calderon to the interpretation of the x-ray that contraband existed which gave legitimate reason to implement the contraband watch.   Thus, even assuming that Defendants Howard, Winnett, Papac and Calderon singled out Plaintiff to take an x-ray, an x-ray alone does not satisfy the objective component to demonstrate an Eighth Amendment violation. *See Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44-48 (1st Cir. 2009) ("An x-ray-a much simpler, less invasive procedure-could have confirmed [the contraband results]."); *Sital v. Burgio*, 592 F.Supp.2d 355, 359 (W.D.N.Y. 2009) (finding that a contraband watch of six days was not particularly severe or jeopardize the health or safety of the prisoner).   Based on the above, Defendants' summary judgement motion should be granted.  Moreover, given that Plaintiff fails to meet his burden to move forward on the Eighth Amendment Claim, the Court finds it unnecessary to reach the issue of whether Defendants are entitled to qualified immunity.

**IV.    Conclusion and Recommendation**

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Plaintiff has the burden of showing that Defendants violated his rights. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Thomas v. Ponder*, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

For the reasons set forth herein, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment filed on May 10, 2012, be GRANTED

(Doc. 162); and

2.      Defendants Howard, Winnett, Papac, Calderon and Kordan be dismissed.[2]

These Findings and Recommendations will be submitted to the United States District Judge

assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **fourteen (14)**

**days** after being served with these Findings and Recommendations, parties may file written

objections with the court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations."  Parties are advised that failure to file objections within the

specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d

1153 (9th Cir.1991).


IT IS SO ORDERED.

Dated:   December 14, 2012

UNITED STATES MAGISTRATE JUDGE

---

[2] The following claims and defendants are to proceed to trial: Defendants Reed, Mack and Traynham for allegedly placing Plaintiff in a cell that was covered in feces; Defendants Chappel and Barker for violation of Plaintiff's First Amendment rights by allegedly confiscating Plaintiff's menorah and candles.  Doc. 153.